# CHARLESTON

RIDER v. COUNTY COURT OF BRAXTON COUNTY,
HARSHBARGER v. COUNTY COURT OF CABELL COUNTY
AND
CORDRAY v. COUNTY COURT OF MARION COUNTY.

Submitted September 2, 1914. Decided September 15, 1914.

1. STATUTES—*Construction.*

Of two permissible constructions of a statute, one leading to unjust or absurd results and the other to equity and fairness, the latter is to be adopted, upon the presumption that the legislature did not intend the results flowing from the former. (p. 721).

74 W. Va.

2.  ELECTIONS—*Appointment of Registrars—Political Parties.*

Sec. 1 of chap. 45 of the Acts of 1911, sec. 98a I of chap. 3 of the Code of 1913, serial sec. 121, requiring the county court of each county, for the purposes of every general election, to appoint for each voting precinct in its county, two persons for registrars, one from each of the political parties which at the last preceding election cast the highest number of votes in the county, but prescribing no specific rule for ascertainment of the political parties entitled to such representation, falls under the rule of interpretation, just stated, in the application thereof under the facts of each case as it arises in the course of administration. (p. 721).

3.  ·SAME.

And, in such cases, the court and administrative bodies are not limited, in the inquiry as to the question of party status, to the facts recorded in the returns of the preceding election. (p. 716).

4.  SAME—*Appointment of Registrars—Political Parties—Burden of Proof.*

A new political party, or one not previously entitled to representation, by reason of its weakness, seeking the place formerly held by an old, established and dominant party, carries the burden of proof of its ascendancy over the other in the last preceding election. (p. 716).

5.  SAME—*Appointment of Registrars—Political Parties—Test of Strength.*

If such claimant, in the last preceding election, instead of nominating and supporting a complete ticket, embracing candidates for congressional, state and county offices, or some candidates for such offices, so as to make a substantial test of its relative strength against such other party, endorsed or renominated as its own all of the congressional, state, judicial, legislative and county candidates of the other and placed on its ticket candidates differing from those of the other, only for President and Vice-president of the United States and electors, ·it cannot be considered as having prevailed over such older party, in such election, within the meaning of said statute, even though its candidates for the national offices received a larger vote than the candidates of the older party for the same offices and the candidates having their names on both tickets received more votes as candidates of the new party than were cast for them as candidates of the other. (p. 716).

6.  EVIDENCE—*Judicial Notice.*

Courts take judicial notice of matters of common knowledge and current history. (p. 716).

(ROBINSON and WILLIAMS, JUDGES, dissenting.)

Proceedings in mandamus by one Rider against the County

Court of Braxton County, by one Harshbarger against the
County Court of Cabell County, and by one Cordray against
the County Court of Marion County.

*Writs awarded.*

In *Rider* v. *Braxton County Court:*
*Alex Dulin* and *H. H. Moss, Jr.,* for petitioner.
*James E. Cutlip,* for respondent.

In *Harshbarger* v. *Cabell County Court:*
*F. M. Livezey, F. C. Leftwich, E. E. Williams* and *Joseph
M. Sanders,* for petitioner.
*J. S. Marcum* and *D. J. F. Strother,* for respondent.

In *Cordray* v. *Marion County Court:*
*E. F. Morgan* and *M. E. Morgan,* for petitioner.
*J. B. Sommerville,* for respondent.

POFFENBARGER, JUDGE:

In each of the first two proceedings, the chairman of the
Executive Committee of the Republican party, of the county
and, in the other, all the members of such committee are the
relators; and in each case, the prayer of the petition is for the
appointment of Republican registrars in the county, in con-
formity with the provision of Sec. 1 of Chap. 45 of the Acts
of 1911, Serial Sec. 121 of the Code of 1913, requiring the
county court of each county to appoint two competent persons
as registrars in each precinct from the two political parties
which, at the last preceding election, polled the highest num-
ber of votes in the county in which the election is to be held;
it being contended that in each of the three counties in ques-
tion, the Republican party was one of such parties, and it
having been shown that the county courts in said counties
had appointed, as registrars, members of the Democratic party
and the Progressive party respectively, denying to the Repub-
lican party its alleged status.

In each of these counties, there was a full, complete and
regularly nominated Democratic ticket and Republican ticket
in the election held in the year of 1912, carrying candidates
for president and vice-president of the United States and
electors, and a full state, congressional, judicial, county and

district ticket. There was placed upon the ballot likewise a full and complete Progressive ticket made up in the following manner: For President and Vice-President and electors the candidates were different from those of the Republican party and the Democratic party, but for state, judicial, county and district officers the candidates were the same as those on the Republican ticket, so that the personnel of the Progressive ticket differed from the Republican ticket only as to the candidates for President and Vice-President and electors. In each of the counties, the vote cast for Progressive electors was greater than that cast for Republican electors, and no doubt the ballots cast showed the use of more Progressive tickets than Republican tickets in the election. In Cabell County, the votes received by the candidates whose names appeared upon both the Republican and Progressive tickets were recorded separately, the former being only about 1750 and the latter about 3050, while the Democratic vote was nearly 4900. This method of recordation was adopted in Marion County also, and there the candidates for state, congressional, judicial, county and district officers received upon the Republican ticket, about 1650 votes and, upon the Progressive ticket, about 2250, while the Democratic vote was about 4700. In Braxton County, the record does not show any distinction between the Republican and Progressive votes cast for candidates running on both tickets, but it does show a larger vote cast for the Progressive candidates for electors than the Republican candidates for electors, as do the records of the votes in the other two counties.

Much of the argument in support of the petitions for the writs denies the existence, in any of the three counties, of any political party known as a Progressive party, and affirms the existence of only two important political parties in the election of 1912, the Republican and Democratic. This argument, however, must yield to the plain provision of the statute, permitting the organization of new parties by petition, as analyzed and applied in *Morris* v. *Ballot Commissioners,* 71 W. Va. 180, and *Stewart* v. *Ballott Commissioners,* 71 W. Va. 246. The filing of a petition containing the signatures of the requisite number of voters creates a new party in this state

or any district thereof to the extent of enabling it to have a ticket or the names of candidates upon the ballot. As the Progressive party, so organized for the election of 1912, polled more than three per cent. of the entire vote in the state and also more than three per cent. of the vote in each of the three counties to which these controversies relate, it must be considered not only a political party authorized to make nominations, but one also authorized by law to nominate candidates by conventions and primary elections.

This conclusion, however, does not cover the more vital question, whether the Progressive party, as against the Republican party, is one of the two parties polling the highest vote in the election of 1912. There is a Progressive party and a Republican party and both participated in that election. The Democratic party also participated in it and its leading character is admitted. The other two, except as to the national ticket supported exactly the same candidates and, in a large sense, jointly opposed the Democratic party. Between them, there was no test of strength except as to the national ticket. Obviously it was only a partial test. As regards state, congressional, judicial, county and district offices, there was not the slightest controversy between them. A Republican ticket was first nominated by a general primary election, except the candidates for judges of the Supreme Court, who were nominated by a convention, and the Progressives later circulated a petition, renominating or endorsing the same candidates. Whether in matter of form, it was a renomination or an endorsement, there was no substantial contest between the Republican and Progressive organizations for the election of these officers. Both supported the same men as candidates for them. Aside from the contest for the presidency and vice-presidency, there were formally two tickets but, substantially and in fact only one supported by both Progressives and Republicans.

The pleadings in these actions show, and the court judicially knows, as matter of common knowledge and current history, that the Progressive movement and organization were, in their inception, a protest against the action of the Republican National Convention held at Chicago in the year 1912, em-

bracing in their purpose the election to the presidency of a
losing candidate for the Republican nomination in that con-
vention. In order to get his name on the ballot in this state,
it was necessary to use a party name different from that of
the Republican party. His name and the names of his can-
didates for electors could only be placed upon the ticket
under some party name other than those of the Republican,
Democratic, Prohibition and Socialist. He had formerly been
a Republican as had also the great body of his supporters in
all the counties of this state. If his name could have been
gotten upon the official ballot as a Republican candidate,
there is little doubt that it would have been placed upon it
under that name rather than a new one, for it is a matter of
common knowledge that he was considered, by many of his
supporters, as being the rightful nominee of the Republican
party. The Republican State and Congressional district con-
ventions sent a solid Roosevelt delegation to the Republican
National Convention. After these delegates had been selected
and before the National convention had assembled, a state
wide primary election was held for the nomination of Republi-
can candidates for state, judicial, congressional, legislative
and county candidates, and as a general rule, both the Taft
and Roosevelt republicans participated in it and nominated
the ticket subsequently supported by the Republican and
Progressive organizations in the general election. After the
Republican National convention had adjourned, a Progressive
National convention was held in Chicago and this state was
represented in it by delegates selected in some way. That con-
vention nominated Roosevelt and Johnson for President and
Vice-President and later a Progressive state convention was
held in the city of Charleston, made up of delegates selected in
some irregular manner. In as much as the Progressive party
could not then under our statutes nominate candidates other-
wise than by petition, the returns of the last preceding elec-
tion not having shown the existence of such a party, the
Charleston convention amounted to little more than a mere
conference of the supporters of the Progressive candidates
for President and Vice-President. It adopted a platform of
principles embodying those of the Progressive National plat-

form adopted at Chicago and perhaps some others. One of the measures evolved by that convention or conference was the endorsement or renomination of the Republican ticket nominated in the state convention and the state primary, but it was necessary to do that by means of petitions circulated in the various counties of the state.

In so much of the contest for the Presidency as was waged in this state the Progressive vote was larger than the Republican. Under our law, the Progressives could have placed in the field and put on their ticket, bearing their name and the emblem they used, only their candidates for President and Vice-President and electors. In other words, they could have run an independent ticket under a party name and emblem. Had they done so, it is hardly likely any claim of predominancy of the Progressive party over the Republican party would have been made, in view of a larger vote for the independent candidate than that received by the regular one. This was not done, but the situation in the election of 1912 was very similar to the result of such an independent candidacy. What was done by the protesting Republicans in that election was exactly what the protesting Democrats did in the election of 1896. They placed Palmer and Buckner on a ticket denominated The National Democratic Party, or something similar to that, together with a set of candidates for electors and all the regular Democratic state and local tickets. As to everything except the Presidency and Vice-Presidency, the Democratic party united. On that issue alone it was divided. This arrangement was made for a single election and, after that election, nothing more was heard of the National Democratic party. This historic fact forcibly reflects the character of the Progressive organization in the election of 1912. Such was its character in the county of Braxton as is indicated by the evidence of the non-existence of any substantial Progressive organization in that county now. It is further illustrated in the county of Marion by the result of a special election held in that county in the year 1913, for the election of a member of Congress to fill a vacancy; in which the Progressive candidate for congress polled only about one third of the number of votes that was

cast for him on the same ticket in 1912 and less than one half of the number of votes that were cast for the Republican candidate in the special election of 1913. Neither the peculiar and special facts in the Braxton and Marion County cases, indicating the temporary character of the progressive vote, nor anything similar thereto, was disclosed in the Cabell County case, but the conditions out of which the party in that county was born and the influences which brought it into existence were the same as those operative in Braxton and Marion Counties. They were not local but general and national rather than state, as has been already indicated. These special facts confirm and verify the general view of a partial, and not a real and substantial test of strength between the two parties, and show the alleged predominancy of the progressive party was formal and apparent only.

The purpose of the statute is to give representation in the registration of the voters, to the two leading parties in the election about to be held, for it requires each of the registrars to take an oath to support the candidates of the party on whose behalf he was appointed. Its general purpose is the same as that of sec. 7. of chap. 3 of the Code requiring similar representation on the boards of election commissioners, as construed and applied in *Hasson* v. *City of Chester*, 67 W. Va. 278. Both provisions clearly contemplate permanent and substantial party organizations. They assume the maintenance of such organizations for at least two years, for they go back to the results of the last preceding election for the criterion of determination of relative party strength. Both were ordained by the legislature, when the Republican and Democratic parties had been dominant in the state and all the counties for very long periods of time and when there was no indication or prospect of the displacement of either of them by any third party. The status acquired by the two old parties having been deemed by the legislature to be of sufficient value to warrant legal recognition, intent on its part to authorize the loss of such status otherwise than by a substantial and fair test of strength can not well be supposed.

Though the statute makes the result of the last preceding election the criterion by which to ascertain what two parties

are entitled to representation, it does not prescribe any rule for determination of the question under circumstances such as are shown here; wherefore the court, as in other cases, must give the statute a reasonable and just application. It is easy to perceive, that, in the case of three parties of nearly equal strength, some of the candidates of each of them may be elected, and also that, in the case of three parties, two of which are generally strong and the other weak, some of the candidates of the weaker organization may be elected and the others defeated. For such cases, the statute prescribes no rule for determining the question of dominancy. Here we have an equally anomalous situation in the result of the election of 1912. Only a single group of Progressive candidates ran against the candidates of the other two parties for the same offices. Its candidates for all the other offices and the candidates of the Republican party for those offices were the same men, and it is clearly obvious that many Republicans desiring to vote for the Progressive candidates for President and Vice-President used the Progressive ticket as a mere matter of convenience. To have used the Republican ticket for that purpose would have necessitated the transfer of the Progressive candidates for President and Vice-President and the electors on to the Republican ticket with the attendant danger of loss of votes by spoliation of the ballots. The ordinary voter saw no real or practical difference between a vote for the local republican candidates on the progressive ticket and a vote for them on the other, and there could not have been any vigorous contest between the two organizations. It would have broken up the alliance respecting the local ticket and occasioned its defeat.

Our conclusion that the Republican party is entitled to representation in the appointment of registrars, as against the Progressive party, in all of the three counties, is in conformity with the general principle underlying the decision in *State Ex rel* v. *Wright,* 158 S. W. 823, that the leading political party, in the state of Missouri, was the leading party in the state and not in the nation, and that the statute is prima facie confined in its operations to those within its jurisdiction. It likewise accords with the conclusion of a

common pleas court of Pennsylvania as reported in 2 Brewster, 138, holding as follows: ''Where a party elects all the officers but one, they are to be regarded as the party in the majority in their division.'' It also coincides with the idea of substantial justice and equity, embodied in the decis- ion of the New York court in *In re Manning,* 71 Hun. 276, declaring a Republican and a Democratic member of an election board in collusion against the third member, also a Democrat, were the majority of the board, and authorizing the remaining Democratic member to appoint the election officers for his party, as the minority member. In that case, as in *People* v. *Wheeler,* 28 Hun. 540, the court properly subordinated matter of form to substance. In the latter case, an appointing board endeavored to deprive one wing of the Democratic party in New York of representation in the boards of election on account of its refusal to support the nominee of the party for Governor, and the court held that the board was bound to give that element of the party representation along with the other, its refusal to support a single nominee of the party not being deemed an abandonment of the party principles or organization. In the Manning case, the court adopted the rule of interpretation observed by this court in *Hasson* v. *City of Chester,* saying ''The rule is well settled that statutes should receive such construction as will carry into effect the legislature's intention and avoid unjust and absurd conclusions;'' citing *Trinity Church* v. *United States,* 143 U. S. 457; *People* v. *McCombe,* 99 N. Y. 43. Observance of that rule in the application of the statute now under consideration, to the facts herein referred to, will work out just and equitable results in Braxton and Marion Counties and any other interpretation thereof would produce injustice and absurdity. Since the influences which produced the results in those two counties were general in their nature and operative in Cabell County, it is obvious that the results in that county in 1912 afforded no substantial evidence of the loss by the Republican party of its former status as one of the two leading parties. As against an organization having acquired a clear and firm status, a new party claiming to have destroyed such status or to have acquired the position held by

the former, necessarily carries the burden of establishment of its claim as an adverse and hostile party.

Upon these principles and conclusions peremptory writs were awarded in all three counties according to the prayers of the petitions therefor.

*Peremptory Writ of Mandamus Awarded.*

ROBINSON, JUDGE, *(dissenting):*

The syllabus of the majority opinion begins by speaking of two permissible constructions of a statute. To my mind there is but one permissible construction of the statute involved in these cases. That statute is too plain for any other construction than that plainly breathed by its words. It establishes the standard of "equity and fairness" which the legislature deemed right. The construction plainly imported by its terms leads to "no unjust or absurd results", but to results which the proper lawmakers considered just.

That courts may take judicial notice of matters of common knowledge and current history, as is asserted by the majority, all will concede. But the majority opinion for the working out of its conclusions, ignores the plain and ordinarily accepted meaning of the statute and in place thereof takes judicial notice of some things by no means of common knowledge and current history. For instance, it is not a matter of common knowledge and current history that the Republican party in the general election of 1912 received a larger number of votes than did the Progressive party. On the other hand, it has all along been known and conceded that the fact was otherwise. Nor is it a matter of common knowledge and current history that those who voted the Progressive column in that election were so largely Republicans as to make the result other than what the ballots themselves indicated. The ballots tell the result of an election. Never before has any other criterion been recognized, either legally or generally. It is no doubt true, though the fact is not judicially established in these proceedings, that Republicans did vote the Progressive column in the election of 1912. But how many Republicans voted it? And how do we know the sentiments and allegiance of those voting the Progressive column at the

time they voted it, other than by their choice of that column?
Did the Legislature intend us to speculate on all this nearly
two years after the voting? Or did it intend us to take the
actual returns of the last election as the declaration of the
number that made up the Progressive party strength in that
election? In reason, certainty, and fairness it intended the
election returns to control, just as it has stipulated by the.
statute.

The majority opinion, bound by our decisions in *Morris* v.
*Ballot Com.*, 71 W. Va. 180, and *Stewart* v. *Ballot Com.*, 71
W. Va. 246, admits the existence of the Progressive party. It
goes further and admits that the Progressive party in the
election of 1912 received more than three per cent of the
votes polled in the State and in each of the counties of Cabell,
Braxton, and Marion. This is a clear admission that the
Progressive party did have a state ticket and did have county
tickets, notwithstanding its glaring inconsistency with the
inference to be observed all through the majority writing that
the state and county tickets on the Progressive column of·
the ballot were so much of right and title to the Republican
party that when a voter voted that column, he did not vote
the Progressive ticket except for presidential electors. How
does the majority judicially know that the Progressive party
cast three per cent of the vote and thereby obtained a legal
status to nominate by conventions and primary elections for
congressional, state, and county officers, except by the election
returns? If the election returns may be looked to in order
to ascertain a legal status· for a method of nomination why
may they not be looked to for the purpose of ascertaining the
legal status for the right to have registrars and other election
officers appointed? If the theory of the majority that there
was no rivalry and test between the Republican party and the
Progressive party other than as to electors for the Presidency
is sound, how can it figure out that there was rivalry and test
to the extent of three per cent of the vote? If the Repub-
lican tickets, nominated so as legally to have a place in the
Progressive column, were not the tickets of the Progressive
party, it would seem that the Progressive party should be
conceded no votes other than for the Presidency. Reference

to all this is made simply to show how the speculation which the majority opinion uses for finding a standard for legal status runs random. The fixed and certain criterion of the election returns which the statute directs and intends us to employ should not be substitued for any such uncertain method. To substitute the measure prescribed by the people through the Legislature by a measure of the court's own making, is beyond the legitimate province of the court. In the language of Lord Bacon: "Judges ought to remember that their office is *jus dicere,* and not *jus dare;* to interpret law, and not to make law."

It may be true, as the majority opinion infers, that the Progressive party is not as strong now as it was in the election of 1912. Certainly there is no proof before us on that point. Nor has the present strength of the Progressive party anything to do with its right to the appointment of registrars. "The temporary character of the Progressive vote", as the majority opinion calls it, is not a factor. That party by the statute may point to its vote in the last election for the basis of its right to the appointment of registrars, whatever its strength may be at present. In the coming election it may lose the legal status it obtained in the last election, but until that happens the status it acquired in the last election stands for the test of its right.

The majority assert that the courts and administrative bodies in the inquiry as to party status are not limited to the returns of the preceding election. In other words, an election contest may be instituted and carried on two years after the returns are canvassed and settled. It is not ordinarily so. No one reasonably can believe that the Legislature intended such an anomalous thing. Certain it is that the statute has not a word that indicates in the slightest degree that such a thing was intended. But the majority do not merely stop with providing for such a late contest of an election. For the purpose of such contest, they establish a new rule of evidence. And the rule which they establish is in absolute derogation of a rule of the common law in relation to proof. We have always been told that common law rules should prevail until changed by statute. Yet the majority

say that a new political party, though prima facie entitled by the returns of an election to a leading position over an old party, carries the burden of proof of its ascendency. Ordinarily the rule of evidence is just the other way. What word of the statute changes it? None. Why put the burden of proof on the party which has a prima facie lead by the election returns? It is not so in other election contests. Nor is it a reasonable and fair rule. It is not to be presumed that the lawmakers intended to establish it; certainly they would have said so if they did so intend.

That there was no substantial test of strength between the Republican and the Progressive parties in the last election is another theory of the majority. Yet each of these parties had a column representing it on the official ballot. That the Progressive party had such a column on the ballot is full evidence of its recognition and existence as a legal entity. By its column on the ballot it was represented in the election. Those who cast their votes with that column, cast their votes with the Progressive party. What other meaning can the law give their act? A Republican who at a single election votes the Democratic column casts his vote for the time being with the Democratic party. The latter party is entitled to it in the returns as an element of its strength and ascendency, though it was cast by a Republican. Can it be at all different as to the Progressive party, though the votes cast for it may have been largely cast by Republicans? The legal entity of the Progressive party, represented by a column on the official ballot which the law gives it, has just such strength in an election as the number of votes cast through the column which represents the entity. If by any arrangement or argument it is fortunate enough to have its strength enhanced by votes from members of another party, it is certainly entitled to the enhancement. Has it not always been so understood? Wherein did the Legislature indicate that this common understanding was not to continue in the matter of comparing the strength of one party with that of another? Judge POFFEN-BARGER himself, in writing *Peyton* v. *Holley,* 78 S. E. 666, so understood it.

That the candidates on the Progressive column were the

same as those on the Republican column does not alter the case. There is no law against men being the nominees of two political parties at the same time. The candidates on .the Progressive column were the nominees of that party, representing it in the election for the acquirement of party strength, otherwise their names could not through the law have obtained place in the column. The official ballot showed that the Progressive party had legal candidates representing it, for every office to be voted for. The strength of that party is evidenced by the votes cast for the candidates who represented it by their names on the ballot. Though the same names also represented the Republican party by their places in a distinct and different column, yet when a voter chose the names on the ballot wherein they legally stood for the Progressive party, and not where they stood as representing the Republican party, he gave strength to the Progressive party because he voted for the ·candidates legally representing it. That there was a clear cut test of strength between the two parties is quite as certain as if the names of the candidates on the two tickets had been different. The names were only the same as individuals; they were different as to party representation.

For a moment let us look to the words of the statute for verification of their plain meaning. It says that the county court of each county in this state shall ''appoint for each voting precinct in their county, two competent persons as registrars, one each from the political parties which at the last preceding election cast the highest number of votes in the county in which the election is to be held.'' Code 1913, ch. 3, sec. 98aI. How is the county court to say what parties cast the highest number of votes in the county at the last preceding election? Certainly by the returns of that election. Under the law, it canvassed the returns of the last preceding election. By its canvassing it knows which of the parties received the highest number of votes. Clearly to those returns the statute means for it to turn. Turning there it can tell definitely and certainly what the strength of each party is; turning elsewhere it can only wander into fields of uncertainty and party bias. Are we to assume that the Legislature meant

the wide range of the latter and not the fixed standard of the former? We must give to our lawmakers better presumption than that they intended uncertainty and opportunity for partiality, as against certainty by an ascertained and fixed standard of fairness. The election returns in the counties involved in these proceedings, in the election of 1912, showed that the Progressive party acquired a lead over the Republican party, by votes for the nominees legally representing it on the official ballot. Why deny it what it legally acquired? Right wrongs no man. The door which the decision of the majority opens lets in for the future partisan unsettling of election returns long after they have been canvassed and are supposed to be settled.

While I concurred in awarding the writ of mandamus in the Marion County case, it was certainly not because of any view expressed in the majority opinion. In that county the last preceding election was not the election of 1912, but the congressional election held in 1913 for the first district. In the latter election the Republican party recovered in that county the leading status which it had lost in the election of 1912 and is entitled to the appointment of registrars under the terms of the statute. This statute as to the appointment of registrars says the highest number of votes *in the county, at the last preceding election.* It localizes the territory for the determination of the party strength, and looks only to the strength of a party in the county. That would seem to account for its not using the word "general" before the word election. The Legislature most evidently meant in this instance the highest number of votes at the last preceding election covering the county. A congressional election is such an election. It is a fair test of county party strength. In any event the lawmakers saw fit to make this statute unquestionably of different import from that of the sections relating to the appointment of challengers and ballot commissioners, where the party strength in the State at the last preceding general election is made the test. They saw fit to make a local test for the appointment of registrars like that which they made by the section for the appointment of precinct election commissioners. They deemed county test proper for the

appointment of registrars, and a magisterial district test proper for the appointment of precinct election commissioners. We should take the ordinary import of the words used by the lawmakers and follow the same accordingly.

Some cases from other jurisdictions are referred to in the majority opinion. To any discriminating reader of those cases, it is submitted that they lend no justification to the majority's conclusions.

WILLIAMS, JUDGE:

I concur in the foregoing dissenting opinion of Judge ROBINSON.