# CHARLESTON.

N. M. BROWN *et als. v.* BOTTOM CREEK COAL & COKE CO.

Submitted January 10, 1923.  Decided June 12, 1923.

1. DISCOVERY—*Bill Seeking Discovery of Amount of Coal Mined, to Recover Balance of Wages by Miner Under Lever Act, Held Demurrable.*

   A bill in equity by bituminous coal mine workers against their employer, asking for a discovery of the number of tons of coal mined by them after November 1st, 1917, and seeking to recover as a balance of their wages the amount received for such coal from the purchaser in excess of the selling price of the coal ($2.00 per ton for run-of-mine; $2.25 for prepared sizes; and $1.75 for slack or screenings) fixed by the President of the United States under authority of an act of Congress known as the "Lever Act," by executive order of August 21, 1917, on the theory that they are entitled to such increase as a part of their wages by virtue of the permissive order of the Fuel Administrator based upon the agreement of certain coal operators with the United Mine Workers of America of October 6, 1917, known as the "Washington Agreement"; and upon the theory that the excess price so received by their employer from the sale of coal constitutes a trust fund in his hands for the payment of their wages automatically increased by said permissive order; and which bill fails to aver that their employer was a party to such "Washington Agreement," or that they and their employer had agreed upon a penalty provision satisfactory to the Fuel Administrator for the automatic collection of fines in the spirit of the "Washington Agreement;" or, that there being no such agreement between them, their employer substantially complied with the order of the fuel administrator and accepted its terms by posting notice at the mine to the employees announcing an increase in wages and containing therein the substance of the automatic fines and penalties relating to strikes and interruption of the operation of the mines on the part of the miners, and closing the mines or lockout of the men without just cause on the part of the operator, is demurrable.  (p. 293).

2. WAR—*Permissive Agreement of Fuel Administrator, Based on Washington Agreement, Held not to Warrant Increase in Price of Coal in Districts Where Operators and Miners Failed to Agree.*

   The permissive order (above mentioned) for increase in the price of coal did not warrant such increase in any district

in which the operators and miners failed to agree upon said penalty provision for the automatic collection of fines in the spirit of the "Washington Agreement;" except, where conditions did not render an agreement possible, the posting of said. notice to the employees at the mine as above set out operated as a compliance with the permissive order and warranted . the increase in the price of coal. (p. 295).

3.   EVIDENCE—*Courts take Judicial Notice of Laws and Proclamations of the President in Pursuance Thereof, and the Public Notoriety or General Public Interest.*

The courts of this state take judicial notice of the laws of . the United States, and the proclamations of the President of the United States made in pursuance thereof, and of public notoriety or general public interest. (p. 295).

Case Certified from Circuit Court, McDowell County.

Suit by N. M. Brown and others against the Bottom Creek Coal & Coke Company. The circuit court sustained a demurrer to the bill, and certified its ruling to the Supreme Court of Appeals.

*Affirmed.*

*Samuel A. Anderson* and *A. H. Hopkins* and *Russell S. Ritz,* for plaintiffs.

*Strother, Sale, Curd & Tucker,* and *Greever & Gillespie* for defendant.

LIVELY, JUDGE:

The circuit court sustained a demurrer to the bill, and on its own motion certified its ruling to this court for review.

N. M. Brown and thirty-one others, plaintiffs, who sue for themselves and all others who are similarly situated and have similar claims, filed their bill against defendant, a coal mining corporation, seeking a recovery of various indefinite sums which they claim are owing to them as a balance of wages earned by them as employees of defendant during a period of several months beginning the first day of November, 1917. Their claims arise out of the increased price at which defendant sold its coal on the market over and above that prescribed by the President of the United States as the price at which

bituminous coal could be sold under section 25 of an act of Congress known as the "Lever Act." Plaintiffs claim that the excess price at which defendant sold its coal over the schedule of prices for bituminous coal so fixed belongs to them in proportion to the number of tons mined by them during the period aforesaid, and that it constitutes a trust fund in the hands of defendant to which they are entitled; and they seek a discovery of the tonnage mined by them and the prices at which defendant sold the coal so mined and a decree for a distribution of the fund to the employees entitled thereto, including themselves. The bill sets up the "Lever Act" and the power and authority therein delegated to the President; the appointment of H. A. Garfield as fuel administrator thereunder; and the fixing of the price of coal by the fuel administration in the different parts of the United States. The maximum price at which coal could be sold was based on the cost of production and was intended to give the producer a reasonable profit, and prevent profiteering. It appears from the schedule of prices fixed on the 21st day of August, 1917, which is pleaded, that the maximum price in the district in which defendant's mine is located was $2.00 for run-of-mine; $2.25 for prepared sizes, and $1.75 for slack or screenings. The world war was in progress and the cost of living was rapidly advancing and the United Mine Workers of America demanded an increased wage for mining coal. Those operators employing union miners met with representatives of the latter in Washington for the purpose of discussing the demand of the miners and to prevent a general strike which would be disastrous to a successful prosecution of the war, and to afford a reasonable and necessary wage to the mine workers. This conference terminated in an agreement on October 6, 1917, known as the "Washington Agreement," whereby an advance of 10c per ton was agreed to be paid to the miners, and advances ranging from 75c to $1.40 a day for laborers. and an advance of 15c for yardage and dead work. The result of this agreement was an increase to the miners of 50c, and to the best paid laborers of 78c over the wages of April 1, 1914. It became necessary,

in order that the operator should make a fair profit, that the maximum selling price formerly fixed under the Lever act should be raised to meet the advance in wages. Upon a report of the result of the conference by the fuel administrator, accompanied by a request for an increase in the selling price of coal, an amendment to the order of October 21, 1917, relative to prices of bituminous coal fixed by the President, was incorporated in an order issued by the fuel administrator, as follows:

"Amendment to Order of August 21, 1917, Relative to Prices of Bituminous Coal Fixed by President Wilson. Appendix I. It follows:

## ORDER

## THE WHITE HOUSE

Washington, D. C., 27 October, 1917.

The scale of prices prescribed 21 August, 1917, by the President of the United States for bituminous coal at the mine, as adjusted and modified, by order of the United States Fuel Administrator, to meet exceptional conditions in certain localities, is hereby amended by adding the sum of 45 cents to each of the prices so prescribed or so adjusted and modified, subject, however, to the following express exceptions:

(1) This increase in prices shall not apply to any coal sold at the mine under an existing contract containing a provision for an increase in the price of coal thereunder in case of an increase in wages paid to miners.

(2) This increase in prices shall not apply in any district in which the operators and miners fail to agree upon a penalty provision, satisfactory to the Fuel Administrator, for the automatic collection of fines in the spirit of the agreement entered into between the operators and miners at Washington, October 6, 1917.

This order shall become effective at 7 a. m. on October 29, 1917.

(Signed) WOODROW WILSON.

The United States Fuel Administrator announces that in carrying out the terms of the President's order of October 27, 1917, permitting an increase of prices theretofore fixed for the sale of bituminous coal, he will accept as satisfactory in cases where conditions do not render an agreement possible the following as a substantial compliance with the second express exception of the President's order: The posting of a notice at the usual place for posting notices to employees, containing the following announcements:

(1)   An increase of wages effective November 1, 1917, and continuing through the period of the war, but not exceeding two years from April 1, 1918, substantially as provided in the Washington agreement of October 6, 1917.

(2)   The United States Fuel Administrator has directed that if any mine worker or group of mine workers in any way interrupts the operation of the mine or causes a strike, the operator shall deduct from the earnings of each employe, except those who continue at work, the sum of $1 per day for each day or fraction thereof that such mine worker fails to report for work.

All questions arising under the foregoing provision are subject to review by the United States Fuel Administrator.

(3)   If a mine is closed or the men locked out by an operator, without just cause, the United States Fuel Administrator will impose upon and collect from such operator a fine at the rate of $1 per day for each mine worker affected.

All fines imposed under this order shall be paid to the American Red Cross through the United States Fuel Administrator.

(4)   Every mine operator shall file with the United States Fuel Administrator regular reports, on prescribed forms, giving him such information as will enable him to enforce the foregoing order.

> H. A. Garfield,
> United States Fuel
> Administrator.''

The bill charges that defendant did raise the price of its coal 45c per ton and that plaintiffs are entitled to receive

an increase in their wages, as contemplated by the Washington agreement, out of the fund derived from the excess price of the coal sold by defendant. They are not union miners, and did not participate directly or indirectly in the formation of the Washington agreement. They allege that they continued to work after October, 1917, at the wages at which they were employed, and continued to work until the latter part of 1918 without an increase in wages, when they were given an increase, but not sufficient to absorb the increase to which they were entitled from October 1917 until the latter part of 1918. They pray for a discovery of the amount due them by reason of the increase allowed by the order of the fuel administrator and that they be paid the amount due them thereunder, and for general relief.

The right of action is based on the theory that the ''Lever Act'' empowered the President to fix wages for those employed at the mines; that the power to fix prices for coal carried with it the implied authority to increase the wages of those engaged in its production; and that under the order of the fuel administrator of October 29, 1917, hereinbefore set out, no producer of coal, whether he participated in the Washington agreement or not could sell coal at an increased price over that originally fixed without at the same time using that increase to pay his employees.

There are several grounds on which the demurrer is based. The first ground challenges the whole theory of the cause of action set out in the bill. Defendant says the Lever Act authorized the President to fix the price of coal and provided punishment by fine and imprisonment for any violation by a sale of coal at a price greater than that fixed, but did not confer upon any miner any right whatever; that the increase of 45c authorized as a result of the Washington conference, was extended to other districts out of the ''Central Competitive Field'', provided there was a substantial compliance with the provisions set out in the order of October 29, 1917; that neither the President nor the fuel administrator attempted to make any effort thereby to fix wages, but simply fixed the price of coal to take care of the wages otherwise

agreed upon; nor does the order confer upon any employee any right to have or demand increased wages. Another ground of the demurrer is that the plaintiffs do not have the right to join themselves together in seeking the relief, if they have any cause of action, as each one has a separate and distinct claim to which there will be separate and distinct defenses; that each has a complete and adequate remedy at law. Another point of demurrer is that the allegations of the bill are not sufficient to show that there was a trust fund created by any one for them, but that the facts alleged show there was no such intention; that defendant has simply refused to pay to them indefinite amounts which they allege are owing to them for services rendered. Another point of demurrer is that the bill asks for a discovery on the part of the corporation, and no officer or agent of the corporation is joined as a defendant; that defendant could only discover, if required to do so, through some proper officer; that there is a want of proper parties defendant to the bill.

Logically, the first point of demurrer should be considered. Does the bill state a cause of action? Neither the Lever act nor the executive orders are specially pleaded, but they are specifically set up and their substance pleaded. We take judicial notice of the acts of the Congress and the proclamations of the Chief Executive in pursuance thereof. *Spring* v. *Tel. & Tel. Co.,* 86 W. Va. 192. It is not necessary for the purposes of this case to consider and decide whether the Lever act empowered the President to fix the wages of employees at the coal mine. The orders do not attempt to do so, although they may have had the effect of bringing about a raise of 50% in the wages of the miners, and 78% in the wages of the best paid laborers at the mine over the wages of April 1st, 1917, wherever the Washington agreement became effective. The order of October 29, 1917, does not affect the price of coal or wages in the districts in which the Washington agreement does not become effective. The second express exception in the order of the Chief Executive is that the increase in price of coal shall not apply in any district where the operators and miners fail to agree upon a penalty

provision satisfactory to the fuel administrator in the spirit of the Washington agreement. And where they did not agrée, the fuel administrator provided that he would accept as a substantial compliance with the second express exception of the President's order a posting of notices to the employees at the mine, stating that an increase in wages would be effective November 1st, 1917, substantially as provided in the Washington agreement. If an operator did not conform to the Washington agreement substantially, he was not authorized to increase the price of his coal. The authorized increase was to meet conditions arising from increased expense of operation. The Lever act contemplated that the price fixed should be based on the cost of production and prevent profiteering. A survey had been made and the cost of production as contained resulting in a fixed scale of prices for coal promulgated by the order of August 21, 1917. Those prices were to remain where there was no increase in wages. If the new element of expense (increase in wages) was injected, a new basis of prices was established and a corresponding increase in the sale of the product was allowed; and the new price was effective only where the new element of expense entered. Nor was the increase in price allowed even where there was an increase in wages unless that increase was made in the spirit of the Washington agreement which provided for automatic fines and penalties upon both the employer and employee, if certain prohibited things were done by either. The government was concerned in the steady prosecution of work at the mines and a steady movement of coal to the industries and agencies necessary to the prosecution of the war without profiteering by the laborer, the employer or the trader.

The bill does not charge that defendant participated directly or otherwise in the Washington agreement or was bound thereby; nor does it aver that plaintiffs and defendant agreed substantially upon the terms of that agreement; or that the notice to the employees provided for in the fuel administrator's order was posted at the mine. Otherwise the permissive order would not govern nor apply to defendant. It would have no authority to increase the price of its coal;

nor would plaintiffs come within the purview of that order. It will be perceived that automatic fines of $1 per day upon each miner who did not report for work, or who went on strike or in any way interrupted the operation of the mine, were to be deducted from his earnings. Just how that provision would be effective where the miner had no wages coming to him does not appear. There seems to be nothing in the Lever act which would justify fines or imprisonment upon any workman who refused to work. To be bound by such a provision some consent thereto, express or implied, was necessary on the part of the miner. What right have they, then, to any increase in price of coal received by defendant? If defendant had violated the schedule of prices originally fixed, and received 45c per ton more, or $1.00 per ton more, plaintiffs would have no interest in the increase. The fines and penalties provided in the Lever act were not for their benefit. The bill simply charges that defendant sold its coal at 45c per ton increase after the permissive order of October 29, 1917, was promulgated, and assumes that that order applied to and governed wherever there was an increase in the price of coal subsequent to its promulgation, and that it necessarily applied to the district in which defendant's mine was operated. We do not think the averments of the bill show that plaintiffs have any beneficial interest in the fund from which they seek to recover their alleged increase in wages. The bill states no cause of action.

In passing, it may be well to consider, casually, the allegation of the bill that there has been created a trust fund in the hands of defendant for the benefit of plaintiffs and other like employees. The substance of the bill in that regard is that the fuel administrator, by confirmation of the Washington agreement, (by which agreement the operators and United Mine Workers organization agreed upon an increase in wages to be covered by a corresponding increase in the price of coal), and the extension by the order of the fuel administrator of the provisions of that agreement to those operators in any district who should agree with their employees upon a penalty provision, satisfactory to the fuel

administrator, for the automatic collection of fines in the spirit of the ·Washington agreement·; and not to be effective in any district where such agreement was not carried out in its spirit; automatically created a trust fund for the benefit of the employees wherever the employer increased the ·price of coal, such fund to be measured by the gross sum realized from the increase. As above observed, there is no allegation in the bill that the terms and spirit of the Washington agreement were carried out or attempted to be carried out by agreement express or implied, between plaintiffs and defendant; or that there was any compliance by defendant with the terms of the permissive order. The Washington agreement and the orders of the President and fuel administrator are pleaded, and the conclusion is drawn from their existence that because defendant actually increased the price of 45c per ton over the price fixed by the President on August 1, 1917, defendant was bound, under the Lever act and the orders, to pay its employees at the mine the gross sum realized from the increase. Even if there was sufficient allegation in the bill to bring plaintiffs and defendant within the operation of the terms of the Washington agreement and the executive orders promulgated thereon, we do not perceive that the violation of that order created a trust fund in the hands of the mine owner for the benefit of the employees. We perceive no clear relation of trustee and *cestui que trust* which would exist under such allegations. If the increase in selling price belonged to· the mine workers, then the producer would be a mere agent for the collection of a sum owing by the purchaser of the coal, and the mine owner would have no beneficial interest therein. Such view would logically hold that the permissive order was for the purpose of fixing wages instead of regulating the price of coal. A trust must have a specific *res*. Plaintiff says the *res* was the 45c per ton added in the order to take care of the increase in wages of the mine workers at 45c a ton. But which 45c of the selling price received by defendant was subject to the trust? Would the purchaser, knowing of the Washington agreement and the permissive orders, or of an agreement

between the parties, be under a duty to see to the application
of the purchase price? Would there be an equitable lien
of the mine worker on the price paid for each ton for the 45c
increase? Would defendant be guilty of embezzlement or
converting to its own use money of its employees which it re-
ceived from the sale of its coal? If a miner should dig and
load five tons in one day, must that miner wait until the
purchase price is collected for that specific coal before he
would be entitled to receive 45c increase in wages? And
then, if there should be default in payment by the pur-
chaser, would the laborer lose the 45c wage increase if the
purchase price was never paid? To enforce collection for
default would defendant sue as trustee, and not be able to
set up its own contract price for the purchase money? If de-
fendant was a trustee, made so under the Lever act and the
permissive orders, these suggested questions would arise. One
often quoted definition of a trustee is: "A person in whom
some estate, interest, or power in or affecting property of any
description is vested for the benefit of another." It is argued
in the brief of plaintiff's counsel that while there is no alle-
gation in the bill of an intention to create a trust on the
part of defendant, yet the facts alleged impel the conclusion
that a constructive trust arises. At least that is what we
gather from citation of authority, defining and giving in-
stances of constructive trusts. Constructive trusts are di-
vided into three classes: (1) trusts that arise from actual
fraud practiced by one upon another; (2) trusts that arise
from constructive fraud, as where a guardian purchases from
his ward, which purchase may be in good faith and to the
ward's benefit, yet the danger and inconvenience resulting
from contracts of that character is so great, that such con-
tracts are held to be *prima facie* fraudulent, and the courts
construe them into constructive trusts; and (3) trusts
that arise from same equitable principle independ-
ent of any fraud, as where property has been pur-
chased and the purchase price paid, but no deed taken,
equity will raise a trust by construction for the pur-
chaser. Perry on Trusts, sec. 168. We are inclined

to believe that the allegations of the bill would not create a constructive trust or would not make defendant a trustee under any of the classes of a constructive trust above enumerated. However, these observations are made in passing and have little relevancy to whether a cause of action has been stated in the bill. On the assumption that no producer of coal wherever situated could, after November 1, 1917, charge an increased price over the schedule of prices fixed August 21, 1917, without using the fund derived by the increase to pay a corresponding increase in wages to its employees, plaintiff argues: that admitting that wages would not be lowered or raised under the provisions of the Lever act, yet defendant should be estopped to deny that it could be done under that act, because defendant could not accept the benefit of the increase in price without accepting the burdens imposed. The burdens imposed under the Lever act are fines and imprisonment; or if the producer failed to conform to the prices fixed under the authority of that act, or to conform to the regulations of the method of production, sale, shipment, etc., or to conduct his business under the regulations of the President, or failed to conduct it in a manner not prejudicial to the public interest, he was subject to the additional penalty of having his plant and business as a going concern taken over and operated by a governmental agency during the war, or for a part of the time which it was in progress. But, of course, it is not necessary to consider any of these points arising under the demurrer, as we have concluded that the first point, namely, that the bill does not state a cause of action, is well taken.

The ruling of the lower court in sustaining the demurrer is

*Affirmed.*