IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0757

_____

**FILED**
**June 16, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

MICHAEL BLATT and KIM BLATT,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Wayne County
The Honorable Darrell Pratt, Judge
Case Nos. 14-M-015 and 14-M-016

REVERSED

_____

Submitted: May 12, 2015
Filed: June 16, 2015

Charles K. Garnes, Jr., Esq.                Patrick Morrisey, Esq.
Campbell Woods, PLLC                        Attorney General
Huntington, West Virginia                   Derek A. Knopp, Esq.
Counsel for the Petitioner                  Assistant Attorney General
                                            Charleston, West Virginia
                                            Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

CHIEF JUSTICE WORKMAN and JUSTICE LOUGHRY concur in part, dissent in part, and reserve the right to file separate opinions.

SYLLABUS BY THE COURT

1.      "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996).

2.      "The authority to order a dog killed pursuant to W. Va.Code § 19–20–20 (1981), stems solely from a criminal proceeding, and a private cause of action may not be brought for the destruction of a dog under this section." Syl. pt. 4, *Durham v. Jenkins*, 229 W. Va. 669, 735 S.E.2d 266 (2012).

3.      For a magistrate or circuit court to determine that a person has committed the crime described in W. Va. Code § 19-20-20 (1981), it must find, beyond a reasonable doubt, that the person (1) owned, kept, or harbored (2) any dog (3) known to the person (4) to be vicious, dangerous, or in the habit of biting other people. However, the magistrate or circuit court need not determine that a crime has been committed pursuant to W. Va. Code § 19-20-20 (1981) to proceed, at its discretion, to order the destruction of a dog pursuant to that statute. To order the destruction of a dog pursuant to this statute, the magistrate or circuit court must determine that there is satisfactory proof that the dog is dangerous, vicious, or in the habit of biting or attacking other persons or other dogs or animals.

i

4.	"The Double Jeopardy Clause in Article III, Section 5 of the *West Virginia Constitution*, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syl. pt. 1, *Conner v. Griffith*, 160 W. Va. 680, 238 S.E.2d 529 (1997).

Benjamin, Justice:

The Circuit Court of Wayne County ordered that Tinkerbell, a female pit bull terrier be destroyed pursuant to West Virginia's vicious dog statute, W. Va. Code § 19-20-20 (1981), after she injured a neighbor child who was playing in the yard of Michael and Kim Blatt. Tinkerbell is the family pet of the Blatts.

The circuit court's decision ordering that Tinkerbell be destroyed relied on a presumption that pit bull dog breeds are inherently vicious. Because extensive debate exists over whether scientific evidence and social concerns justify breed-specific presumptions, we conclude that courts may not, upon judicial notice, rely solely upon a breed-specific presumption in ordering the destruction of a dog pursuant to W. Va. Code § 19-20-20. The adoption of breed-specific presumptions with regard to this statute is the prerogative of the Legislature, not the judiciary. In the absence of a breed-specific presumption, we determine that neither the remaining findings of fact in the circuit court's destruction order nor the facts presented in the record provide satisfactory proof that Tinkerbell must be euthanized. Consequently, we reverse the circuit court's destruction order.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

1

Eight-year-old L.L.[1] was injured by a dog named "Tinkerbell" (nicknamed "Tink"), a two-year-old female pit bull terrier or pit bull terrier mix,[2] owned by L.L.'s neighbors, petitioners Michael and Kim Blatt. The State brought charges against both Mr. and Ms. Blatt, alleging that the they violated W. Va. Code § 19-20-20 by knowingly harboring a dog that is vicious, dangerous or in the habit of biting or attacking other persons. The circuit court conducted two hearings, the first on June 17, 2014, and the second on June 30, 2014, and entered two orders following those hearings. Although the circuit court found the Blatts not guilty of harboring a vicious dog, the court nevertheless

---

[1] Consistent with this Court's practice in cases involving juveniles, we refer to the children in this case using their initials. *See* W. Va. R. Appellate Procedure 40(e).

[2] In using the term "pit bull," this Court is cognizant that

> [l]ike the familiar generic terms spaniel and retriever, which refer not to one, but to several recognized canine breeds characterized by common phenotype, origin, or traditional use, the term pit bull describes a subgroup of the larger terrier breed group. Within the subgroup of dogs commonly referred to as "pit bulls," the American Kennel Club ("AKC") registers the Staffordshire bull terrier and the American Staffordshire terrier, and the United Kennel Club ("UKC") registers the Staffordshire bull terrier and the American Pit Bull terrier. Neither organization recognizes a "pit bull" breed or group.

Kristen E. Swann, Note, *Irrationality Unleashed: The Pitfalls of Breed-Specific Legislation*, 78 UMCK L. Rev. 839, 840 (2010) (footnotes omitted); *accord* Safia Gray Hussain, Note, *Attacking the Dog-Bite Epidemic: Why Breed-Specific Legislation Won't Solve the Dangerous-Dog Dilemma*, 74 Fordham L. Rev. 2847, 2851–52 (2006).

ordered the destruction of Tinkerbell, finding her to be vicious. Testimony at the two hearings produced the following evidence.[3]

In May 2012, an animal rescue organization, River City Bully Buddies, acquired Tinkerbell from a high-kill animal shelter in Mercer County on the recommendation of volunteers at the shelter. Tinkerbell was about six months old when she was acquired by the rescue organization. Tinkerbell lived with the founder of the rescue organization, Capri Billings, and her three minor children from May 2012 until August 2013. Ms. Billings described the dog as "very loving, playful" but that the dog is "very high energy"—a trait Ms. Billings testified is "typical of many dogs." Ms. Billings also testified that while Tinkerbell was in her family's care, they "never had any problems with her at all."

The Blatts first met and interacted with Tinkerbell at an adoption event sponsored by River City Bully Buddies. Kim Blatt testified that Tinkerbell was "the greeter" at these events and that the dog was not troubled by children touching her ears and tail. The Blatts later contacted Ms. Billings about adopting Tinkerbell. Before the

---

[3] During the June 17, 2014, hearing, Michael Blatt appeared in person and by counsel Darren Queen, and Kim Blatt appeared in person and by counsel Alison R. Gerlach. The Blatts obtained new counsel, Charles K. Garnes, for the June 30, 2014, destruction hearing. Mr. Garnes also appeared for this appeal. In both hearings below, the State was represented by Prosecuting Attorney Thomas M. Plymale and Assistant Prosecuting Attorney Gary L. Michaels.

Blatts were permitted to adopt the dog, the family had an hour-and-a-half to two-hour "meet-and-greet" with Ms. Billings and Tinkerbell to, as Ms. Billings testified, "make sure there's good energy flow." The Blatts then fostered Tinkerbell for a two-week period to ensure that the dog and the family were a good match. The Blatts ultimately adopted Tinkerbell in August 2013.

In the months that followed, Tinkerbell was regularly with the Blatts' nine- and six-year-old children. The family walked Tinkerbell in the neighborhood on a leash, and the dog slept in bed with the children. Ms. Blatt testified that in addition to spending time with her own children, Tinkerbell also interacted with several of her nieces and nephews. Ms. Blatt stated that the family "never had any problem with [Tinkerbell]" and that she never witnessed the dog display any aggressive behavior.

On the afternoon or evening of March 31, 2014, L.L. and his sister were playing together in the Blatts' side yard with the Blatts' two children. The children threw a ball while Mr. Blatt grilled hamburgers on the back porch. During this time Tinkerbell was confined to the inside of the house and the fenced-in front yard. Mr. Blatt testified, "I just had [the dog] in the house. There was really no reason. I just, you know, she was in the house. I had food and I didn't, just didn't think anything of it." He later stated that the dog had been confined to the house to allow a wound on her paw to heal.

4

Upon arriving at the Blatt residence, Mr. Blatt's mother accidently left the front gate open and Tinkerbell got out of the fenced-in front yard. The dog proceeded to run to the back of the house where the family and friends were playing. The dog, which according to Mr. Blatt "loves to fetch and chase balls and sticks," found a ball the children had been playing with and began to bury it. The Blatts' nine-year-old child, N.B., testified as to what happened next:

> Q [Counsel for the Blatts] . . . Tell me what you guys were doing.
> A [N.B.]     Well, [L.L.] was on the ground. Tink came around in the back yard where we all were. She found a ball, popped it, was trying to bury it. Then, [L.L.] tried to go grab it. He was, like, to throw it. But, Tink went up to get the ball. She has no hands, so she used her mouth. She nipped, bit, nipped him to get the ball down. So she actually didn't mean - - hurt him a little too much.
> Q     Okay. She was going after the ball?
> A     Yeah.

N.B. further explained upon questioning by the State:

> And [L.L.] was on the deck, too, but he came down. When he came down, he dropped the ball. I went up on the deck. That's when I was on the deck. And Tink got the ball. Before [L.L.] got the ball, Tink got it. And she popped it, and she was trying to bury it. And the boy grabbed it out of her mouth, went like this (indicating), and the dog tried to get the ball, but she accidently nipped the boy.
> . . . .
> [S]he was trying to get the ball. He was like this, (indicating), and she was jump - - when he was like this, (indicating), Tink got on his shoulders and tried to get the ball down.

When asked about his use of the word "nip," N.B. said, "It means that she did not mean to bite him. She just wanted to get the ball down." N.B. was the only eye-witness to the bite who testified; L.L. was not questioned during the proceedings below.

After the dog bit L.L.,[4] he held his hands against his face, which was bleeding, and he cried for his parents. Meanwhile, N.B. testified that "[Tinkerbell] got down, hunkered down on the ground. Then, she ran right into the house, and she hid under the bar stools." Mr. Blatt also testified as to Tinkerbell's behavior directly after the bite, stating, "What I observed was, after I heard the scream, I turned to look and see what happened. Everybody rushed over; and Tinkerbell ran in the house and hid under a chair. The back door was standing wide open. She, lickety-split, was gone."

While Mr. Blatt's mother's husband, a nurse, attended to L.L., Mr. Blatt went to get L.L.'s parents. L.L.'s father, Jason Owen, testified:

> Me and my wife were sitting at the computer when a knock came on the door. Answered the door. It was Mr. Blatt. He said, "[L.L.] would like to see one of you two guys,"

---

[4] The Blatts stipulated during the June 17, 2014, hearing that the dog bit L.L. once. During both hearings before the circuit court, the State did not dispute that the dog bit L.L. one time. N.B. was cross-examined regarding his testimony characterizing the bite as a "nip." He was asked, "So, when you say, you use the word 'nip', that's what your parents told you to use, right?" N.B. replied in the affirmative, explaining, "It means that she did not mean to bite him." We note that Merriam-Webster's Collegiate Dictionary 838 (11th ed. 2005), defines "nip" as follows: "to catch hold of and squeeze tightly between two surfaces, edges, or points : PINCH, BITE <the dog *nipped* his ankle>."

because he was at Mr. Blatt's house playing with the kids. And he said, "My dog got out and it seems like he bumped [L.L.] in the face and, you know, so he would like to see one of you."

So, my wife proceeded to walk over. And I was standing there. I watched my wife and son come down the driveway. And my wife said, "This isn't cool." And then when [L.L.] got there, his face was ripped and stuff like that. And a few minutes later my daughter came in screaming because of what happened. She was terrified.

So, at that time, Mr. Blatt was already at home, and I walked over there. I'm, like, "What happened?" I said, "What's going on?" And, like, I said, "Your dog bit my son's face off." And I think, I believe it was Kim, said, "It was only his lip." I said, "It was his face." And then I walked back home, and then we ended up taking him to the hospital.

Mr. Blatt testified:

I was unaware that it was a bite at first. I was on the porch. The kids were over in the side yard. The kid put his hands over his face. Yes, there was blood. I did not see it. So I didn't know what happened. I ran to get the parents, of course.

When asked by his counsel if he was "plotting in some way to minimize or try to stop trouble when [he] told them that the kid had gotten his nose bumped, or whatever," Mr. Blatt said, "No, sir. I was just trying to get them united. The boy was screaming for his parents."

L.L.'s mother, Tara Schmidt, testified, "I had somebody come and get me and take [L.L.] to the hospital, because my husband had to stay home with the little kids." At the hospital, L.L. received five stitches to his upper lip and nine stitches to his bottom lip to close the laceration caused by the bite. Hospital records indicate that L.L.

7

experienced pain and bleeding but that the degree of bleeding was minimal and the degree of pain was minimal. Photographs in the record show swelling and redness around the laceration and an abrasion near L.L.'s right eye.

Following the incident with L.L., Tinkerbell was seized by Animal Control Officer Phillip Hickey with the Huntington-Cabell-Wayne Animal Shelter. Mr. Hickey described Tinkerbell's demeanor as follows: "Quite honestly, the behavior was - - it was mild demeanored [sic] when I picked up the dog. I was, frankly, just shocked that it had shown aggression, but that happens." Mr. Hickey described Tinkerbell as "Pit Bull, or mostly Pit Bull." He testified that during training in connection with his employment, he was taught that pit bull breeds are aggressive by nature, but he stated that Tinkerbell's mild behavior was atypical in that she did not appear aggressive.

Once Tinkerbell was seized by Animal Control and taken to the animal shelter, she was subject to a quarantine period. Wayne County Health Department Registered Sanitarian and Epidemiologist, Carl Farley, ensured that following a quarantine period, the dog was in good health. Mr. Farley described Tinkerbell as a "Pit Bull Dog Terrier."

Gregory Iseli, Assistant Director of the Huntington-Cabell-Wayne Animal Shelter testified that while he never physically observed Tinkerbell, he would describe

her, based on photographs, as a "Pit Bull." Mr. Iseli also provided testimony as to the nature of pit bull dogs, stating, "Normally, [pit bulls are] more aggressive than other breeds. Not saying all of them are, but most cases that I have dealt with . . . you have a harder time handling them." Following quarantine, Tinkerbell was released to the Blatts.

L.L.'s father testified that sometime after his son was bitten, he went to the Blatts' home and met Tinkerbell for the first time. He said that when he petted her, "the tail wagged a little bit, but not a whole lot. But, she pretty much was more hyper than aggressive." L.L.'s father described the dog's demeanor at that time as "not vicious, but a little hyper."

The State brought charges against the Blatts pursuant to W. Va. Code § 19-20-20, which provides that it is unlawful for a person to own, keep, or harbor any dog known by that person to be vicious, dangerous or in the habit of biting or attacking other persons. If a dog is found to be vicious, dangerous, or in the habit of biting or attacking other persons or other dogs or animals pursuant to that statute, a circuit court or magistrate court may order the destruction of that dog.

A bench trial was held on June 17, 2014. During the trial, the circuit court ruled that "I can't find beyond a reasonable doubt that these Defendants . . . knew that dog to be vicious, or dangerous, or in the habit of biting or attacking people." The circuit

9

court then decided to hold an additional hearing to determine whether it should order the destruction of the dog. In the June 30, 2014, destruction hearing, the circuit court took judicial notice of the evidence presented in the June 17, 2014, hearing and made the following findings:

> [I]t's my belief and I'm going to find that this is a Pit Bull Terrier, or a mixed breed of Pit Bull Terrier, that generally accepted by this [c]ourt, and also in other states and also the West Virginia Supreme Court, as being inherently vicious and unpredictable.
> . . . .
> Also, findings that I made in the June 17th hearing that Tinkerbell did bite this child, and the child was in a place where the child should have been and had a right to be, playing with other children, lawfully there. Indication was that there was a possibility that the child was grabbing at a ball at the same time the dog was, which in my opinion, the child should be given the benefit of the doubt there, not the dog.
> In my opinion, and also will find, that one attack such as this one is sufficient to declare a dog to be vicious and dangerous, and in the habit of biting people. And the testimony given today was that this dog was going after a ball at the same time that the child was. The child wasn't trained on how to deal with a vicious dog, so the child was bitten.
> So I think there's satisfactory proof that Tinkerbell is a vicious dog, is a dangerous dog, and in the habit of biting persons.
> I'm going to order and direct that this dog be turned over to the Humane Officers of the Cabell-Wayne-Huntington Animal Shelter and this dog be euthanized.

After the hearings, the circuit court entered two orders. The order acquitting the Blatts' was entered on July 10, 2014 ("the acquittal order"). In that order, the circuit court made the following findings of fact:

10

That the dog, "Tinkerbell", is a Pitt [sic] Bull Terrier or Pitt [sic] Bull Terrier mix-breed;

That Pit Bull Terriers are inherently vicious and aggressive dogs;

That the dog "Tinkerbell" had not previously demonstrated a vicious demeanor while living at the Blatt home;

That State presented no evidence of prior complaints about this dog and the Animal Control Officers testified that this dog seemed to have a "mild demeanor" when picked-up and while housed at the shelter;

That "Tinkerbell" escaped the fenced yard when someone left the gate open.

That "Tinkerbell" bit the minor child, in an unprovoked attack, while the child was playing in a side yard, where he had a right to be safe and secure.

The circuit court then made the following conclusions of law in the acquittal order:

Thereupon, the Court proceeded to take testimony and evidence in this matter, and the Court does hereby find that the evidence presented in this case identified the dog as a Pitt [sic] Bull Terrier or Pit Bull Terrier mix breed; that the [c]ourt and other Courts in this State, and many other States have found this breed of dog to be of a vicious and aggressive nature; that this dog did bite a child in the face; that the attack was unprovoked; Therefore, the [c]ourt finds that the dog, "Tinkerbell" is a vicious dog, and a dangerous dog, and in the habit of biting persons.

The [c]ourt finds that this is a criminal proceeding for requiring proof beyond a reasonable doubt that the defendants knew the dog to be "vicious, dangerous, or in the habit of biting or attacking other persons." Given the evidence presented in this case that there were no prior attacks by the dog and no prior acts of aggression, the [c]ourt finds that the State has not proven beyond a reasonable doubt that defendants knew the dog to be vicious.

. . . .

It is **ORDERED** that the Defendants are **ADJUDGED Not Guilty** of the criminal offense of knowingly owning and keeping a vicious animal.

The court entered an order ordering the destruction of Tinkerbell on July 7, 2014 ("the destruction order"). The destruction order states the following, in pertinent part:

> 1. The [c]ourt denies the Defendant's oral motion to dismiss and finds that the current case is distinguished from *Durham v. Jenkins*, 229 W.Va. 669, 735 S.E.2d 266, 2012, in that the current case was brought pursuant to a criminal prosecution by the Office of the Wayne County Prosecuting Attorney and not a private citizen
> . . . .
> 3. The [c]ourt takes judicial notice of all evidence and testimony from the criminal trial conducted on June 17, 2014 in 14-M-015 and 14-M-016. In that all witness [sic] described and identified the dog as a Pitt Bull [sic] or Pitt Bull [sic] mix bred [sic].
> 4. The [c]ourt takes judicial notice of the decision in Wayne County Circuit Court case of 09-CM-AP-004, 09-CM-AP-005, and 09-CM-AP-006, that declared a city ordinance valid that prohibited citizens from possessing pit-bulls inside the City limits because of the nature and danger of the breed of dogs, and notes that the West Virginia Supreme Court of Appeals upheld the Court's decision in <u>Steve Hardwick and Sharon Nalley v. Town of Ceredo</u>, Memorandum Decision No. 11-1048, 2013.
> 5. The [c]ourt **FINDS** that [c]ourts in Maryland, Alabama, Florida, Pennsylvania, [and] Kansas have found that the breed of dog known commonly as a pit-bull terrier is dangerous and aggressive and are unpredictable in nature, and present a unique public health hazard. Therefore, the [c]ourt **FINDS** that there is a presumption that pit-pull terrier breeds are dangerous, aggressive, a public health hazard and are unpredictable in nature.
> 6. Based upon the expert testimony, presented by Animal Control Officers in Criminal Case Number: 14-M-015 and

14-M-016,[5] the [c]ourt **FINDS** that the dog in this case known as "Tinkerbell" or "Tink" is a pit-bull terrier or a mix pit-bull terrier, and as a breed pit-bull terriers that [sic] are inherently vicious and unpredictable.

. . . .

8. The [c]ourt **FINDS** that 'Tinkerbell" did bite a child and caused [sic] severe injuries to the child; that the child was playing in an area where the child was permitted to be when he was attacked by "Tinkerbell", and the attack was unprovoked.

9. The [c]ourt **FINDS** that one unprovoked attack of a child is sufficient evidence of satisfactory proof that the dog is vicious, dangerous and in the habit of biting people.

10. The [c]ourt **FINDS** satisfactory proof that "Tinkerbell" is vicious, dangerous, and in the habit of biting people.

11. Therefore, the Court **ORDERS** the Defendants to deliver "Tinkerbell" to the Cabell-Huntington-Wayne [sic] Animal Shelter to euthanize "Tinkerbell".[6]

(Footnotes added). The court entered a stay of destruction order to allow the Blatts to appeal the court's decision. The court ordered that the Blatts be responsible for the costs

---

[5] No witness during either hearing in this case was found by the circuit court to qualify as an expert, and no witnesses gave testimony described by the witness as his or her expert opinion. It appears that the persons the circuit court described as experts were Gregory Iseli and Phillip Hickey. The Blatts' counsel did not object to the testimony of these individuals regarding Tinkerbell's breed classification, and the Blatts do not now challenge on appeal the circuit court's characterization of these witnesses as experts.

[6] The destruction order provided that Tinkerbell be held at the shelter in June 2014. The Blatts filed their notice of appeal in July 2014. Rule 29 of the West Virginia Rules of Appellate Procedure permits a party to file a motion "for expedited relief in connection with an action pending before this Court." "The motion for expedited relief shall set forth in specific detail the reasons for the request." W. Va. R. Appellate Procedure 29. Given the harm that may befall a dog held for a lengthy period of time in a shelter, *see* Mcneely & Lindquist, *infra* Part III.B.2, at 100 n.25 (discussing how a dog named Beans suffered from a number of health problems as a result of being caged at the animal shelter for an extended period of time), we encourage parties to cases such as these to file motions to expedite pursuant to Rule 29.

associated with maintaining the dog at the shelter during the appeal. The Blatts appealed the destruction order to this Court.

## II. STANDARD OF REVIEW

Our standard of review is well settled: "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. pt. 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996).

## III. ANALYSIS

### A. Destruction hearing and double jeopardy

W. Va. Code § 19-20-20 (1981) provides:

> Except as provided in section twenty-one [§ 19-20-21] of this article,[7] no person shall own, keep or harbor any dog known by him to be vicious, dangerous, or in the habit of biting or attacking other persons, whether or not such dog wears a tag or muzzle. Upon satisfactory proof before a circuit court or magistrate that such dog is vicious, dangerous, or in the habit of biting or attacking other persons or other dogs or animals, the judge may authorize the humane officer to cause such dog to be killed.

---

[7] Pursuant to W. Va. Code § 19-20-21 (1981), any person may keep "a dog which is generally considered to be vicious, for the purpose of protection," but the person must acquire a special license to do so from the county assessor and secure the animal as directed by the statute.

(Footnote added). Pursuant to W. Va. Code § 19-20-19, "A person who violates any of the provisions of this article for which no specific penalty is prescribed is guilty of a misdemeanor . . . ." The elements of the crime described in W. Va. Code § 19-20-20 are that a person (1) own, keep, or harbor (2) any dog (3) known to the person (4) to be vicious, dangerous, or in the habit of biting other people. As with any crime, if one of the elements of the crime cannot be proved beyond a reasonable doubt, then the person charged with the crime must be acquitted.

In the case at bar, the Blatts were found not guilty of violating W. Va. Code § 19-20-20 because the circuit court determined that they did not know their dog was vicious. In other words, the circuit court found that the third element of the crime—knowledge—was not satisfied beyond a reasonable doubt. Following the acquittal, the circuit court conducted a destruction hearing to determine whether the dog should be destroyed.

The Blatts argue that the circuit court erred by holding a destruction hearing and proceeding to order the destruction of the dog despite having acquitted the Blatts of violating W. Va. Code § 19-20-20. The Blatts also assert that the destruction hearing violated double jeopardy principles.

15

With regard to whether the circuit court erred by holding a destruction hearing, the Blatts rely on language in *Durham v. Jenkins*, 229 W. Va. 669, 673, 735 S.E.2d 266, 270 (2012), which states, "For a magistrate or circuit court to obtain authority to order a dog killed, the magistrate or judge must first find, upon conducting a criminal proceeding, that a crime described in the first sentence of § 19-20-20 has been committed." We determine that this language in *Durham* is overly restrictive in light of the statute and our actual broader holding in *Durham* interpreting that statute, which states that "[t]he authority to order a dog killed pursuant to W. Va.Code § 19–20–20 (1981), stems solely from a criminal *proceeding*." Syl. pt. 4, in part, *Durham*, 229 W. Va. 669, 735 S.E.2d 266 (emphasis added). Specifically, a conviction in a criminal proceeding is not a prerequisite to the separate consideration of whether a dog should be destroyed. Thus, to clarify the application of this statute and our holding in *Durham*, we now hold that for a magistrate or circuit court to determine that a person has committed the crime described in W. Va. Code § 19-20-20 (1981), it must find, beyond a reasonable doubt, that the person (1) owned, kept, or harbored (2) any dog (3) known to the person (4) to be vicious, dangerous, or in the habit of biting other people. However, the magistrate or circuit court need not determine that a crime has been committed pursuant to W. Va. Code § 19-20-20 (1981) to proceed, at its discretion, to order the destruction of a dog pursuant to that statute. To order the destruction of a dog pursuant to this statute, the magistrate or circuit court must determine that there is satisfactory proof that the dog is dangerous, vicious, or in the habit of biting or attacking other persons or other dogs or

16

animals. Accordingly, we determine that the circuit court did not err by engaging in a proceeding collateral to the criminal matter to determine whether Tinkerbell should be destroyed pursuant to W. Va. Code § 19-20-20.

Similarly, the destruction hearing did not violate double jeopardy principles. The double jeopardy clause of the West Virginia constitution "provides immunity from further prosecution where a court having jurisdiction has acquitted the accused." Syl. pt. 1, in part, *Conner v. Griffith*, 160 W. Va. 680, 238 S.E.2d 529 (1997); *see also* W. Va. Const. art. III, § 5 ("No person shall . . . be twice put in jeopardy of life or liberty for the same offence."); U.S. Const. amend. V ("No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ."). At the time of the destruction hearing, the prosecution of the Blatts had ended, and the destruction hearing did not place them in jeopardy of life or liberty for the offense of knowingly owning, keeping, or harboring a dog that is vicious, dangerous, or in the habit of biting or attacking other persons. Therefore, we conclude that the circuit court did not err by conducting a destruction hearing collateral to the criminal proceeding.

### B. Errors of Fact and Law

### 1. The Circuit Court's Breed-Specific Presumption

The circuit court's two orders made factual findings that "Pit Bull Terriers are inherently vicious and aggressive dogs" and that "there is a presumption that pit-bull

terrier breeds are dangerous, aggressive, a public health hazard and are unpredictable in nature." The Blatts assert that this "breed-specific bias is improper and against the applicable statutes and case law of the State of West Virginia." The State argues that the circuit court's presumption is not clearly erroneous. We agree with the Blatts.

In making its breed-specific findings, the circuit court relied on the fact that this Court affirmed in a memorandum decision an order from the circuit court recognizing such a presumption. The circuit court also relied on the fact that other jurisdictions have adopted breed-specific presumptions.

The memorandum decision of this Court described by the circuit court is *Hardwick v. Town of Ceredo*, No. 11-1048, 2013 WL 149628 (W. Va. 2013) (memorandum decision). In that case, the petitioners appealed their convictions for violating a municipal ordinance prohibiting ownership of pit bull terriers within the Town of Ceredo. The petitioners argued that "the ordinance assumes a dog to be vicious based merely upon its breed without any further evidence," *Hardwick*, at *1, and they argued that this made the ordinance unconstitutional. The circuit court's order concluded that the ordinance was a legitimate exercise of the City's police powers, finding:

> That each Defendant's dogs are of the breed that is typically referred to generically as pit bull dogs which are aggressive by nature, have been known as attack animals with strong massive heads and jaws, and have been found to represent a public health hazard. The majority of jurisdictions have accepted the proposition that dogs of this type have a

18

propensity to be aggressive and attack without provocation and it is well established that such dogs have gotten a lot of notoriety as being dangerous to public health and safety.

*Id.* at *2. This Court affirmed the petitioners' convictions, adopting the circuit court's order.

Upon our review of *Hardwick*, we find that it does not support the circuit court's adoption of a presumption that pit bull breeds are inherently vicious or dangerous under W. Va. Code § 19-20-20. First, the legislation challenged in *Hardwick* was a city ordinance of the Town of Ceredo. The ordinance itself created the presumption regarding the nature of pit bull breeds; it was not a judicially created presumption. Second, this Court, in deciding *Hardwick*, did not address a breed-specific presumption outside of the context of the particular ordinance at issue. Third, the ordinance did not speak to the traits described in W. Va. Code § 19-20-20: dangerousness, viciousness, or being in the habit of biting or attacking other people or dogs. The ordinance spoke only to the aggressiveness of pit bull breeds. *Hardwick* simply does not support the circuit court's finding that pit bull breeds are, as a matter of law, inherently vicious or dangerous within the context of W. Va. Code § 19-20-20. More importantly, *Hardwick* does not stand as authority that a specific dog is dangerous, vicious, or in the habit of biting or attacking.

To further support adopting a breed-specific presumption, the circuit court also relied on a finding that "[c]ourts in Maryland, Alabama, Florida, Pennsylvania, [and]

19

Kansas have found that the breed of dog known commonly as a pit-bull terrier is dangerous and aggressive and are unpredictable in nature, and present a unique public health hazard." The circuit court does not cite to any specific statutes or case law from these jurisdictions to support its point.

With regard to authority from other jurisdictions, we have said that "cases referred to from other jurisdictions . . . are, of course, not of controlling force or effect or binding in authority upon this Court. They are, however, entitled to great respect and should be regarded as persuasive authority." *Burless v. W. Va. Univ. Hosps., Inc.*, 215 W. Va. 765, 774 n.9, 601 S.E.2d 85, 94 n.9 (2004) (quoting *Edlis, Inc. v. Miller*, 132 W. Va. 147, 167, 51 S.E.2d 132, 141–42 (1948)). With this in mind, we have examined the relevant law in the jurisdictions mentioned by the circuit court, and we find that it does not support the circuit court's adoption of a breed-specific presumption.

In Maryland, the Court of Appeals has said with regard to pit bulls, "the extreme dangerousness of this breed, as it has evolved today, is well recognized." *Matthews v. Amberwood Associates Ltd. Partnership, Inc.*, 719 A.2d 119, 127 (Md. 1998) (determining liability in tort for a dog attack). However, in Maryland, the fact that a dog is of a certain breed, standing alone, cannot provide sufficient proof that a specific dog is dangerous. *See Ward v. Hartley*, 895 A.2d 1111, 1117 n.7 (Md. Ct. Spec. App. 2006); *McDonald v. Burgess*, 255 A.2d 299, 303 (Md. 1969); Md. Code Ann., Cts. &

20

Jud. Proc. § 3-1901(b) (West 2014). Furthermore, the Court of Appeals has not applied any breed-specific presumption in determining whether a dog's behavior warrants criminal action against an owner or the destruction of the dog. The Court of Appeals has recognized that the control or banning of pit bull breeds is accomplished pursuant to legislation. *Matthews*, 719 A.2d at 127 n.4 ("A number of states or municipalities, recognizing the unique danger pit bull dogs pose to their citizens, have enacted legislation that classify pit bull dogs as vicious, thus enabling them to control or ban this breed's presence in their communities.").

Like Maryland, Kansas has only acknowledged the validity of breed-specific presumptions encapsulated within local ordinances. *See Hearn v. City of Overland Park*, 772 P.2d 758, 768 (Kan. 1989) (determining that a local ordinance containing a pit-bull-specific presumption did not violate the plaintiffs' equal protection rights).

In Alabama, the supreme court has held that in tort actions, "an owner or keeper of an animal will be charged with knowledge of the propensities of the breed of animal he or she owns." *Humphries v. Rice*, 600 So. 2d 975, 978 (Ala. 1992). However, the Alabama court has not extended this to permit a presumption that a specific breed is "dangerous" for purposes of determining tort liability. *See Gentle v. Pine Valley Apartments*, 631 So. 2d 928, 932 (Ala. 1994) (citing favorably *Lundy v. California*

21

*Realty*, 170 Cal.App.3d 813, 216 Cal.Rptr. 575 (1985), which refused to take judicial notice that the German Shepherd Dog breed is inherently dangerous). As with Maryland and Kansas, Alabama's supreme court has not applied a breed-specific presumption in determining whether a dog's behavior warrants criminal action against an owner or the destruction of the dog.

Florida and Pennsylvania are set apart from Maryland, Alabama, and Kansas in that Florida and Pennsylvania both have legislation that criminalizes the ownership of a dangerous dog when all of the elements of the crimes described in the relevant statutes are satisfied. Fla. Stat. § 767.13(2) (1994); 3 Pa. Cons. Stat. § 459-505-A (2008). However, neither the Florida Statutes nor the Pennsylvania Consolidated Statutes contain any provision providing that there is a presumption that particular breeds are dangerous. While the Florida judiciary has upheld ordinances containing presumptions regarding pit bull breeds, *see, e.g.*, *State v. Peters*, 534 So. 2d 760 (Fla. Dist. Ct. App. 1988), these presumptions have not been applied to the state's dangerous dog legislation. In Pennsylvania, the Legislature has gone so far as to forbid the enactment of local ordinances that prohibit or limit specific dog breeds. 3 Pa. Cons. Stat. § 459-507-A(c) (2008) ("A local ordinance . . . may not prohibit or otherwise limit a specific breed of dog." (in part)). In the realm of tort liability, Florida's courts have explicitly refused to find that pit bull breeds are inherently vicious. *See, e.g.*, *Olave v. Howard*, 547 So. 2d 349, 350 (Fla. Dist. Ct. App. 1989) ("We are not prepared to say, as appellant requests,

22

that any dog with a trace of pit bull ancestry is under the law deemed vicious." (quoting *Bessent By & Through Bessent v. Matthews*, 543 So. 2d 438, 439 (Fla. Dist. Ct. App. 1989))).

In addition to examining the law in the jurisdictions referenced by the circuit court and determining that it does not support the adoption of a breed-specific presumption with regard to W. Va. Code § 19-20-20, we also find that it is pertinent to examine whether the language of W. Va. Code § 19-20-20 supports the presumption and whether the circuit court could take judicial notice of the presumption.

Initially, we observe that W. Va. Code § 19-20-20 does not explicitly or implicitly provide for a breed-specific presumption. We have recognized that courts "are obliged not to add to statutes something the Legislature purposely omitted." *Williamson v. Greene,* 200 W. Va. 421, 426, 490 S.E.2d 23, 28 (1997) (emphasis omitted) (quoting *Banker v. Banker*, 196 W. Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996)). By adding language to a statute omitted by the Legislature, the judiciary acts as a "superlegislature," which is prohibited by the Constitution of West Virginia. *State ex rel. Cnty. Court of Marion Cnty. v. Demus*, 148 W. Va. 398, 401, 135 S.E.2d 352, 355 (1964) ("[T]he courts of this state are forbidden by [Article V of the West Virginia Constitution] to exercise legislative authority of any kind."); *see also* syl. pt. 2, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009) ("This Court does not sit as a superlegislature,

23

commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal *Constitutions*.").

Although a court may not read into a statute language purposefully omitted, courts of this state are not required to "insulate themselves from all knowledge of happenings and events in the world about them, and pretend ignorance to that which among the mass of citizens is common knowledge," *State ex rel. City of Charleston v. Sims*, 132 W. Va. 826, 847, 54 S.E.2d 729, 741 (1949); they "may, and should, take notice . . . of current events of a public nature." *Id.*; *see also* syl. pt. 3, *Brown v. Bottom Creek Coal & Coke Co.*, 94 W. Va. 287, 118 S.E. 284 (1923) ("The courts of this state take judicial notice of the laws of the United States, and the proclamations of the President of the United States made in pursuance thereof, and of public notoriety or general public interest."); *Boggs v. Settle*, 150 W. Va. 330, 338, 145 S.E.2d 446, 451 (1965) ("While courts are permitted to take judicial notice of certain facts, it is well settled that a trial judge is not permitted to base a finding upon facts which are merely matters of his personal knowledge . . . ."); *Rider v. Cnty. Court of Braxton Cnty.*, 74 W. Va. 712, 722, 82 S.E. 1083, 1086 (1914) (Robinson, J., dissenting) ("That courts may take judicial notice of matters of common knowledge and current history . . . all will concede."); *Peyroux v. Howard*, 32 U.S. 324, 342 (1833) ("It cannot certainly be laid

24

down as a universal, or even as a general proposition, that the court can judicially notice matters of fact. Yet it cannot be doubted, that there are many facts, particularly with respect to geographical positions, of such public notoriety, and the knowledge of which is to be derived from other sources than parol proof; which the court may judicially notice."). Thus, for this Court to uphold the circuit court's presumption regarding pit bull breeds, the presumption that pit bull breeds are inherently vicious and dangerous must be a matter of common knowledge.

The inquiry into whether breed-specific presumptions are appropriate or justifiable has been the subject of numerous court cases and scholarly publications. Those opposing such presumptions argue that any dog, regardless of its breed, "can become dangerous under the right set of circumstances[; thus,] banning particular breeds will not achieve the result that communities desire—to reduce the number of dog bites and the injuries sustained from such bites." Heather K. Pratt, Comment, *Canine Profiling: Does Breed-Specific Legislation Take a Bite Out of Canine Crime?*, 108 Penn. St. L. Rev. 855, 876 (2004) (footnote omitted). Others question whether "there [is] a rational relationship between public safety and subjecting dogs . . . to unusual restrictions based on their appearance [instead of] their behavior." Swann, *supra* note 2, at 851. Those in favor of pit-bull-specific presumptions rely on what are "allegedly immutable pit bull

characteristics," *Id.* at 852, tied to the breed's "genetic constitution," *Id.* at 835,[8] or the fact that pit bulls were bred as fighting dogs. *Id.* at 841 ("Thanks to the perverse ingenuity of those who cultivated aggressiveness in the breed, the pit bull now epitomizes a paradox: man's best friend turned natural enemy of humanity." (internal quotation marks omitted)).[9] Similar positions have been taken with regard to other breeds,

---

[8] While there is research that "suggests genetics contribute to the likelihood a dog will exhibit aggression," Swann, *supra* note 2, at 853, environmental and experiential factors may also contribute to the behavioral predispositions of different breeds. *Id.* at 853 & n.129; *see also Nardi v. Gonzalez*, 630 N.Y.S.2d 215, 217 (City Court of Yonkers N.Y. 1995) (suggesting that a German Shepherd dog, depending on training, can be a trusted guard dog or vicious).

[9] Writer Devin Berstien has noted that pit bull breeds have been associated with a predisposition for aggression because they were originally bred as fighting dogs. Devin Burstein, *Breed Specific Legislation: Unfair Prejudice & Ineffective Policy*, 10 Animal L. 313, 325 (2004). However, Burstein asserts that "aggression toward humans was a trait despised by those breeding pit fighting dogs." *Id.*; *see also* Hussain, *supra* note 2, at 2852–53 ("[B]ecause the human handler had to be in the fighting ring with the dog to hold it in its starting position and to separate fighting dogs if necessary, aggression towards humans was not tolerated.").

Additionally, we note that the perception of pit bull breeds has changed dramatically over time.

> In the early part of the twentieth century, pit bulls were considered the epitome of the all-American dog. The first war dog, Stubby, was a pit bull. Pete the Pup from "the Little Rascals" was an American Staffordshire Terrier, one of the three breeds comprising pit bulls. Teddy Roosevelt kept his pet pit bull in the White House. However, the pit bulls' wholesome image was tarnished in the late 1980s after a series of highly publicized attacks. Extensive media coverage of severe attacks and deaths inflicted by pit bulls pushed public fear of the dogs to public hysteria, and their popularity

(continued . . .)

including German Shepherds and Rotweillers. *See* Mcneely & Lindquist, *infra* Part III.B.2, at 109.

In view of the disagreement surrounding breed-specific presumptions, it is clear to us that the viciousness or dangerousness of *any* breed within the meaning of W. Va. Code § 19-20-20 is not a simple factual matter of which a magistrate or circuit court can take judicial notice. *See Rivers v. New York City Hous. Auth.*, 694 N.Y.S.2d 57, 58 (N.Y. App. Div. 1999) (concluding that the court below had erred by taking judicial notice of "the vicious nature of pit bulls"); *Carter v. Metro North Assocs.*, 680 N.Y.S.2d 239, 240 (N.Y. App. Div. 1998) ("On the subject of the propensities of pit bull terriers as a breed there are alternative opinions that preclude judicial notice such as was taken by the Court."); *Tracey v. Solesky*, 50 A.3d 1075, 1091 (Md. 2012) (Greene, J., dissenting) ("[W]hy should appellate courts even consider taking judicial notice of facts relating to dog bite statistics that are clearly in dispute?"); *cf.* syl. pt. 2, *Johnston v. Mack Mfg. Co.*, 65 W. Va. 544, 64 S.E. 841 (1909) ("The habits and propensities of domestic animals are matters of common knowledge to all men, and expert testimony to prove the vicious propensities of a particular kind of animals in general, after they become a certain age, is

---

> began to grow among those looking for tough guard or status dogs that could be trained to attack. Pit bulls have become the current villains of the dog world . . . .

Hussain, *supra* note 2, 2853–54 (footnotes omitted) (internal quotation marks omitted).

inadmissible for the purpose of proving that the owner of an animal of that class had knowledge of his vicious propensity."). Given the conflicting positions with regard to breed-specific presumptions and the public policy underlying such presumptions, it is apparent to us that the Legislature is far better equipped than the judiciary to consider the adoption of a breed-specific presumption applicable to W. Va. Code § 19-20-20. The Legislature is capable of scrutinizing the plethora of scientific and statistical evidence[10] associated with the propensities for viciousness or dangerousness in any individual breed. With regard to pit bull breeds specifically, the Legislature is also better able to delineate the particulars of a breed-specific presumption, such as what dog breeds or breed mixes qualify as pit bulls[11] and how those dogs should be identified to be subject to the

---

[10] "Although pit bulls are implicated in a disproportionate number of serious and fatal attacks, critics contend that these statistics are incorrect and misleading . . . ." Hussain, *supra* note 2, at 2870. Critics assert that some dogs are prescribed to the "pit bull" category generally instead of a specific breed, and dogs may be classified as a pit bull breed based on subjective identifications that may be incorrect. *Id.* Critics also contend that "statistics may not accurately convey the danger posed by" pit bulls breeds because of the difficulty in ascertaining the actual population of different dog breeds in the examined areas. *Id.* at 2870–71; *see also* Swann, *supra* note 2, at 851–52 (suggesting that a disproportionately high pit bull population countervails the inference that multiple bite incidents involving pit bulls indicates that pit bulls are inherently dangerous); Larry Cunningham, *The Case Against Dog Breed Discrimination by Homeowners' Insurance Companies*, 11 Conn. Ins. L.J. 1, 17–37 (2004) (describing in great detail how dog-bite statistics may not accurately present the nature of the dog bite problem because of how data is collected, what data is collected, and how data is analyzed).

[11] *See supra* text accompanying note 2.

presumption.[12] Thus, we conclude that the circuit court clearly erred by adopting a presumption that pit bull breeds are vicious, dangerous, aggressive, a public health hazard, and unpredictable in nature within the meaning of W. Va. Code § 19-20-20.[13]

### 2. The Circuit Court's Legal Conclusion that Tinkerbell is Vicious, Dangerous, and in the Habit of Biting People

The circuit court concluded that Tinkerbell is "vicious, dangerous, and in the habit of biting people" within the meaning of W. Va. Code § 19-20-20. Aside from its finding of a breed-specific presumption, the circuit court relied on its findings that "'Tinkerbell' did bite a child," that the dog "caused severe injuries to the child," and that "one attack such as this one is sufficient to declare a dog to be vicious and dangerous, and in the habit of biting people." The Blatts dispute the determination that Tinkerbell is vicious, dangerous, and in the habit of biting people, arguing that the circuit court's

---

[12] "Other breeds share some of the hallmark features of pit-bull-type dogs," which can make establishment of parameters for determining what dogs are subject to a breed-specific presumption difficult. Swann, *supra* note 2, at 854–55; *see also* Hussain, *supra* note 2, at 2852 (stating that "variations among and within" the pit bull breeds recognized by the American Kennel Club and the United Kennel Club make it difficult "to determine whether a particular dog should be characterized as a pit bull and to differentiate between pit bulls and other breeds").

[13] While the case before the Court is not an appeal of a conviction under W. Va. Code § 19-20-20, we believe it is important to recognize that the application of a breed-specific presumption in a criminal proceeding prosecuted pursuant to this statute would be unconstitutional. This Court has held that "'"[i]t is unconstitutional to shift the burden of proof to a defendant on any element of a crime[ ]."' *State v. Jenkins,* 191 W.Va. 87, 93, 443 S.E.2d 244, 250 (1994) (quoting *Sandstrom v. Montana,* 442 U.S. 510[] (1979))." *Pullin v. State*, 216 W. Va. 231, 235, 605 S.E.2d 803, 807 (2004).

29

conclusion of law is unsupported by the facts presented below. The State argues that the circuit court's decision was proper and that "one unprovoked attack of a child is sufficient evidence that the dog is vicious." Upon our *de novo* review, we determine that the circuit court's conclusion that Tinkerbell is vicious, dangerous, and in the habit of biting people under W. Va. Code § 19-20-20 is error.

The authority of the Legislature to enact a statute that regulates personal property—in this case, dogs[14] that are vicious, dangerous, or in the habit of biting or attacking people or animals—is derived from the State's police power. *See, e.g.*, *Quesenberry v. Estep*, 142 W. Va. 426, 436, 95 S.E.2d 832, 838 (1956) ("The police power of the State is vested in the legislative branch of the government. It may be employed or delegated by the legislature subject only to the control of the courts to the extent that they may properly act, and under the police power the legislature may provide for the protection of the safety, health, morals, and general welfare of the people."). The destruction of dogs that are vicious, dangerous, or in the habit of biting or attacking people or animals pursuant to W. Va. Code § 19-20-20 is justified by the State's interest in protecting the public from such animals. *See Woods v. Cottrell*, 55 W. Va. 476, 482, 47

---

[14] Dogs are declared to be personal property in West Virginia by W. Va. Code § 19-20-1 (1975). *See also* syl. pt. 5, *Carbasho v. Musulin*, 217 W. Va. 359, 362, 618 S.E.2d 368, 371 (2005) ("Dogs are personal property and damages for sentimental value, mental suffering, and emotional distress are not recoverable for the negligently inflicted death of a dog.").

S.E. 275, 278 (1904) ("The legislature may determine when that which is otherwise property shall cease to be such if kept against law. It is subject to police power."); *Peoples Program for Endangered Species v. Sexton*, 476 S.E.2d 477, 479 (S.C. 1996) ("Property in dogs is of an imperfect or qualified nature and dogs may be subjected to peculiar and drastic police regulation by the state . . . ."); *Sentell v. New Orleans & Carrollton R.R. Co.*, 166 U.S. 698, 704 (1897) ("Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the State, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens. That a State, in a *bona fide* exercise of its police power, may interfere with private property, and even order its destruction, is as well settled as any legislative power can be which has for its objects the welfare and comfort of the citizen."); 4 Am. Jur. 2d *Animals* § 19 (2015) ("Legislators may permit dogs to be destroyed or otherwise regulated for the safety and protection of citizens."). However, the Court has long recognized that this type of exercise of the police power—the destruction of property without compensation—is "harsh in operation . . . and hence subject to strict[] limitations." *State ex rel. Austin v. Thomas*, 96 W. Va. 628, 633, 123 S.E. 590, 592 (1924); *see also State v. Goodwill*, 33 W. Va. 179, 185, 10 S.E. 285, 287 (1889), *overruled on other grounds by White v. Raleigh Wyo. Min. Co.*, 113 W. Va. 552, 168 S.E. 798 (1933) ("[I]n cases of great emergency, engendering overruling necessity, property may be taken or destroyed without compensation.").

31

As we recognized above, W. Va. Code § 19-20-20 does not contain a breed-specific presumption, and neither magistrates nor circuit courts may take judicial notice of a breed-specific presumption under this statute. Thus, a circuit court or magistrate is limited to considering a dog's past behavior in determining whether that dog poses a risk of future harm to the public such that the risk warrants exercising the State's police power to destroy the dog. *Cf. State v. George K.*, 233 W. Va. 698, 708, 760 S.E.2d 512, 522 (2014) ("The examination of crimes that have allegedly been committed indicates whether the incompetent defendant poses a *future* risk of harm.").[15] That risk is expressed in the terms of viciousness, dangerousness, or whether a dog is in the habit of biting or attacking people or animals. Where a dog's behavior does not constitute a risk of future harm, the State may not exercise its police power to destroy that dog. *See Goodwill*, 33 W. Va. at 185, 10 S.E. at 287 ("[I]f [the Legislature] passes an act ostensibly for the public health or safety, and thereby destroys or takes away the property of a citizen . . . then it is for the courts to determine whether it is a proper and reasonable

---

[15] In a dissent to the majority decision in *Martin v. Williams*, Judge Haymond suggested that the power to abate a public nuisance—"an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons," *Hark v. Mountain Fork Lumber Co.*, 127 W. Va. 586, 595, 34 S.E.2d 348, 354 (1945)—should never be exercised "when the power to regulate will accomplish the same end without the destruction of property." 141 W. Va. 595, 627, 93 S.E.2d 835, 852 (1956) (Haymond, J., dissenting) (internal quotation marks omitted). *See also State Fire Marshal v. Sherman*, 277 N.W. 249, 251 (Minn. 1938) ("When the police power of the state is exerted against property, it is ordinarily to regulate its use, not to destroy it. Destroying or depriving the owner thereof is a last resort, unless the property is of such nature that its use or possession cannot be other than for evil.").

exercise of the power, and, if not, declare it void."). With this in mind, we proceed by examining the circuit court's conclusions that Tinkerbell is vicious, dangerous, and in the habit of biting people.

Initially, we determine that the facts presented during the two hearings below do not support the circuit court's conclusion that Tinkerbell is "in the habit of biting people" within the meaning of W. Va. Code § 19-20-20. Upon examining the entirety of the appendix record, we can find evidence of only one instance in which Tinkerbell has bitten any human: the bite giving rise to this case. Thus, we conclude that the circuit court's finding that Tinkerbell is in the habit of biting—a "habit" requiring repeated behavior—is in error.

In proceeding to evaluate the viciousness and dangerousness of Tinkerbell pursuant to W. Va. Code § 19-20-20, we note that while these concepts have not been significantly explored under this statute, they have been examined by this Court and the courts in other jurisdictions with regard to tort liability. In syllabus point 2 of *Jividen v. Law*, 194 W. Va. 705, 461 S.E.2d 451 (1995), we held that to maintain an action for strict liability in tort for an injury caused by an animal, the injured party must show that the animal had "a dangerous or vicious propensity" and that the owner knew of that propensity. Although this Court has not explicitly delineated behavior establishing a dangerous or vicious propensity in this context, it did state in *Jividen* that "[w]hile we are

aware of authority to the contrary, . . . traits like rambunctiousness and friskiness are insufficient to impose strict liability." 194 W. Va. at 715, 461 S.E.2d at 461. In syllabus point 2 of *Butts v. Houston*, 76 W. Va. 604, 86 S.E. 473 (1915), the Court held that in tort, viciousness can be determined by repeated vicious acts committed by the animal at issue upon the person or property of others.

Other jurisdictions have recognized that the dangerousness or viciousness of an animal in tort actions can be established from the incident giving rise to the cause of action, even where that incident occurs during play. For instance, the Supreme Court of Hawaii has held:

> The owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and insofar as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them. In this respect, a vicious or dangerous disposition or propensity may consist of mere mischievousness or playfulness of the animal, which, because of its size or nature, might lead to injury, for it is the act of the animal, rather than its state of mind, which charges the owner or keeper with liability.

Syl. pt. 6, *Farrior v. Payton*, 562 P.2d 779 (Haw. 1977); *see also Alex v. Armstrong*, 385 S.W.2d 110, 114–15 (Tenn. 1964) ("'[T]he law makes no distinction between an animal dangerous from viciousness and one merely mischievous or dangerous from playfulness.'" (quoting *Owen v. Hampson*, 62 So. 2d 245, 248 (Ala. 1952))). However,

34

not all jurisdictions impose liability for injuries resulting from playfulness. *See, e.g.*, *Bitonti v. McGeever*, 2 N.Y.S.3d 882, 884 (N.Y. Sup. Ct. 2015) ("[E]vidence of 'normal canine behavior' . . . is insufficient to demonstrate vicious propensities . . . ."); *Clark v. Brings*, 169 N.W.2d 407, 412–13 (Minn. 1969) (determining that a bite inflicted by a cat during play did not constitute evidence of viciousness).

While dangerousness and viciousness are concepts that have been explored in tort actions in both this and other jurisdictions, we observe that these actions are designed to compensate an injured party and do not involve the destruction of personal property and the lawful exercise of the police power. Comparing the operation of these concepts in tort to the operation of the concepts pursuant to W. Va. Code § 19-20-20 is like comparing apples to oranges. If this Court applied those concepts equally, all dogs that cause injury during play, regardless of whether the injury was caused inadvertently, could be found to be dangerous or vicious under the statute and could be subject to destruction.[16] As we discuss more fully below, this result would be contrary to the legislative intent behind the statute. Thus, the tort cases discussing viciousness and dangerousness are not particularly persuasive in determining what animal behavior

---

[16] We note that the dangerous dog statutes in Florida and Pennsylvania provide explicit direction as to what constitutes behavior that would warrant destroying a dog. The standards set forth in the destruction statutes are not equivalent to those applied in tort cases. Thus, while an incident involving a dog may give rise to liability for damages in these jurisdictions, the incident may not warrant criminal sanction or the destruction of a dog. *See* Fla. Stat. §§ 767.04, .11, .13; 3 Pa. Cons. Stat. §§ 459-101 to -1101.

constitutes viciousness or dangerousness within the meaning of W. Va. Code § 19-20-20.[17]

In determining whether Tinkerbell is vicious under the statute, we look to the common understood meaning of the word. The word "vicious" is commonly understood to mean "dangerously aggressive." Merriam-Webster's Collegiate Dictionary 1393 (11th ed. 2005); *see also* Cynthia A. Mcneely & Sarah A. Lindquist, *Dangerous Dog Laws: Failing to Give Man's Best Friend a Fair Shake at Justice*, 3 J. Animal L. 99, 105 (2007) ("[S]ome aggressive dog behaviors are *normal*, and even *desirable* by humans." (citing Otto H. Sigmund, D.V.M, *Merck Veterinary Manual*, at 1176–77 (Susan B. Aiello, D.V.M, ed., 8th ed. 1998))). The circuit court concluded that Tinkerbell is vicious, and it premised this finding on the presumption that pit bulls are inherently vicious and aggressive and that Tinkerbell is a pit bull. The circuit court's only finding of fact that supports its conclusion that Tinkerbell is vicious is its breed-specific presumption. Because we determined in Part III.B.1, *supra*, that this finding of fact was in error, it cannot support the circuit court's conclusion that Tinkerbell is vicious.

Further, upon our review of the facts in the record, we do not believe that the evidence establishes satisfactory proof that Tinkerbell's behavior constituted an

---

[17] We emphasize that our review herein is strictly limited to the meaning of dangerousness and viciousness within the meaning of W. Va. Code § 19-20-20.

"unprovoked attack" that was "intended to dominate or master" the injured child. *See* Merriam-Webster's Collegiate Dictionary 24 (11th ed. 2005) (defining "aggression"). We believe it just as likely, if not more so, that the child was accidently bitten during what both the dog and child perceived as the course of play. Mr. Blatt testified that Tinkerbell loves to fetch and chase balls, and the only witness to the incident who testified, N.B., stated that L.L. took the ball from the dog, that L.L. held the ball as if to throw it, and that the dog "accidently" bit L.L. in an attempt to get the ball. None of the witnesses at either hearing testified that they observed any aggressive behavior on Tinkerbell's part before or after the bite.[18] Moreover, both Mr. Blatt and N.B. testified that Tinkerbell ran into the Blatts' home directly after L.L. was bitten. Thus, because the facts do not adequately

---

[18] Published works on dog behavior suggests that "[a]n aggressive dog considering biting will have raised hackles, curled lips, and bared teeth." Mcneely & Lindquist, *supra*, at 105 (citing John W.S. Bradshaw & Helen M.R. Nott, *Social and Communication Behaviour of Companion Dogs, in The Domestic Dog: It's Evolution, Behaviour and Interactions with People*, at 118 (James Serpell ed., Cambridge Univ. Press 1995). Furthermore, while we reiterate our conclusion in Part III.B.1, *supra*, regarding breed-specific presumptions, we do note that some courts supporting such presumptions have taken judicial notice that "pit bull terriers are known to have the capacity to continue an attack until forced to stop," *Cleveland v. Johnson*, 825 N.E.2d 700, 704 (Cleveland Mun. Ct., Ohio 2005) (citing *City of Akron v. Tipton*, 559 N.E.2d 1385, 1387 (Akron Mun. Ct., Ohio 1989), and that "the Pit Bull bites to kill." *Starkey v. Twp. Of Chester*, 628 F. Supp. 196, 197 (E.D. Pa. 1986) (holding that an ordinance providing that pit bulls are dangerous was constitutional because the Township could reasonably determine that pit bulls are dangerous based on testimony from the Township's Health Officer.). In the present case, there is no evidence that Tinkerbell had raised hackles, curled lips, or bared teeth directly prior to biting L.L., and the evidence shows that Tinkerbell retreated from L.L. directly after administering a single bite.

support the circuit court's conclusion that Tinkerbell is vicious or aggressive, the court's conclusion is in error.

Finally, we determine that the facts do not support the circuit court's conclusion that Tinkerbell is dangerous. Any dog may certainly be considered "dangerous" in that all dogs are "able or likely to inflict injury or harm." Merriam-Webster's Collegiate Dictionary 315 (11th ed. 2005); *see* Pratt, *supra* Part III.B.1, at 858 ("[A]ny dog can be dangerous."); Hussain, *supra* note 2, at 2848 ("[A]ll breeds of dog can and do inflict severe injury and death . . . ."). Indeed, "[i]t is common knowledge that horses buck, cattle roam, cats stray and dogs bite." *Blaha v. Stuard*, 640 N.W.2d 85, 88 (S.D. 2002); *see Sylvester v. Maag*, 26 A. 392 (Pa. 1893) ("[I]t is the original nature of the horse to run and for a dog to bite."). The fact that biting is part of a dog's nature should be a surprise to no one; as nine-year-old witness N.B. aptly noted, dogs have no hands, and so they *must* use their mouths to take hold of things. Because biting involves sharp teeth and pressure, an object or person on the receiving end of a bite may be harmed. *See* Mcneely & Lindquist, *supra* at 136 ("Dogs generally cause harm by using their elongated snouts and numerous sharp teeth to bite. . . . A dog also can engage crushing power with his jaws . . . .").

Surely, the Legislature, in enacting W. Va. Code § 19-20-20, did not intend to deem every dog as dangerous for engaging in behavior that is a part of its inherent

nature: biting. *See* syl. pt. 2, in part, *Click v. Click*, 98 W. Va. 419, 127 S.E. 194 (1925) ("It is . . . the duty of a court to disregard a [statutory] construction . . . when such construction would lead to injustice and absurdity."). Even the State's counsel conceded during oral argument that he did not believe the Legislature intended that every dog that bites a child be destroyed. Instead, we find that the statute requires circuit courts and magistrates to examine the facts and circumstances surrounding an incident involving a dog—in this case, a bite—to determine whether a dog is dangerous and deserving of destruction pursuant to the statute.

Upon reviewing the facts and circumstances surrounding the bite in this case, we conclude that they do not support the circuit court's determination that Tinkerbell is dangerous within the meaning of W. Va. Code § 19-20-20. The facts do not establish satisfactory proof that Tinkerbell exhibited behavior outside that which might be expected of a dog during play. While this incident clearly illustrates that Tinkerbell— or any dog—can cause harm, we do not believe that the facts in the record establish the likelihood that Tinkerbell poses such a risk of future harm to the public that the risk would warrant her destruction.[19] To the extent that the circuit court determined otherwise, the court has erred.

---

[19] As we observed above, every dog can be dangerous. The harm dogs can pose can range from injuries occurring as the result of normal dog behavior to vicious attacks causing death, and this spectrum of harm is not limited by a dog's breed. *See* Pratt, *supra*

(continued . . .)

## IV. CONCLUSION

Because the circuit court's July 7, 2014, destruction order is fundamentally premised on errors of fact and law, we conclude that the order must be reversed.[20] The Clerk shall issue our mandate forthwith.

---

Part III.B.1, at 858 (citing to an incident in which a Pomeranian, a small lap dog, killed a six-month-old child). In this case, L.L. suffered an injury requiring that he receive fourteen stitches. Instances like this highlight how important it is that dog owners educate themselves and others, especially children, on the harm—accidental or otherwise—that dogs can inflict on humans and how to avoid those dangers.

> As with intra-human relationships, the essential ingredient to defusing conflict that predictably and understandably occurs with cohabitation of any species is to pay closer attention to what the other side is attempting to communicate, and to understand his or her motivation and needs. We cannot require dogs to study and understand our behavior before choosing to act on their perceptions; thus, we humans as the "higher species" must educate ourselves on the true nature of the dogs with whom we have lived for thousands of years, with the goal of better protecting ourselves and our canine friends.

Mcneely & Lindquist, *supra*, at 104.

[20] Our consideration of this matter is limited to the statutory issue before us and our conclusion is not intended in any way to minimize the physical and related consequences of L.L.'s injuries. Specifically, our conclusion does not preclude any civil action related to L.L.'s injuries.

We also find it pertinent to note that

> [i]n an obvious effort to further ensure the protection of the public, the Legislature has also recently provided for a

(continued . . .)

Reversed.

---

private cause of action by which persons injured by a dog may seek to have that dog euthanized. W. Va. Code § 19-20D-1 *et seq.* This article provides that the action must be brought before a magistrate court, it lists a number of elements necessary for maintaining the action, and it states that a petitioner must prove his or her case by clear and convincing evidence. W. Va. Code § 19-20D-2.

*Robinson v. City of Bluefield*, 234 W. Va. 209, ___ n.5, 764 S.E.2d 740, 748 n.5 (2014) (Benjamin, J., concurring) (emphasis omitted).