IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOSEPH RIAD, | § | |
| | § | No. 249, 2023 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S21C-02-032 |
| BRANDYWINE VALLEY | § | |
| SPCA, INC., a Delaware corporation, | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: March 13, 2024
Decided: June 10, 2024

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED.**

William D. Fletcher, Jr., Esquire, Dianna E. Stuart, Esquire, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware, *for Appellant Joseph Riad*.

Kevin J. Connors, Esquire, MARSHALL DENNEHEY, P.C., Wilmington, Delaware, *for Appellee Brandywine Valley SPCA, Inc.*

**TRAYNOR**, Justice:

This is a dog bite case brought by a plaintiff who was bitten by a dog while at a facility operated by an animal welfare organization. The Superior Court entered summary judgment in favor of the organization, and the plaintiff appealed.

Delaware's "dog bite statute," found at 15 *Del. C.* § 3053F, provides that, subject to limited exceptions, a dog owner is "liable in damages for any injury, death, or loss to person or property that is caused by such dog . . . ." "Owner" is defined in 16 *Del. C.* § 3041F as "any person who owns, keeps, harbors, or is the custodian of a dog." Liability under the statute is strict, i.e., not dependent on a showing that the dog owner was negligent in its handling of the dog.

The principal question we must answer in this appeal is whether an animal welfare organization is exempt from strict liability under the statute. Following the lead of two earlier Superior Court opinions, the trial court held that the statute does not apply to such organizations. To conclude otherwise would be, in the Superior Court's judgment, to disregard the legislature's intent when it enacted the statute, which was "to rein in irresponsible dog owners who were keeping vicious dogs as pets by eliminating the 'one free bite rule.'"[1] This understanding of the statute is, in our view, misguided; it bypasses the statutory text, which contains limited

---

[1] *Riad v. Brandywine Valley SPCA, Inc.*, 2023 WL 4140774, at *3 (Del. Super. Ct. June 22, 2023) ("Opinion") (quoting *Tilghman v. Delaware State Univ.*, 2012 WL 3860825, at *11 (Del. Super. Ct. Aug. 15, 2012)).

exceptions, none of which are relevant here, and defines the word "owner" in unambiguous terms. Given the lack of ambiguity, it was inappropriate for the Superior Court to engage in a speculative inquiry into the General Assembly's intentions at the time of the dog bite statute's enactment. In short, if the organization owned, kept, harbored, or was the custodian of the dog when it bit the plaintiff, it is liable in damages to him for his injuries. Hence, we reverse the Superior Court's entry of summary judgment.

I

A

On February 4, 2019, a large, mixed-breed dog was found roaming Germay Drive in Wilmington, Delaware and was brought by animal welfare officers to the Brandywine Valley SPCA ("BVSPCA"), a non-profit animal welfare organization that takes in stray or surrendered animals and offers some of those animals for adoption.

BVSPCA staff observed that the three-year-old, 107-pound dog, named "Ceelo," was "very large and scared."[2] During his intake, Ceelo lunged at one of the veterinarians when, after a series of other vaccinations, she attempted to administer a rabies shot. A BVSPCA behavioral specialist noted that Ceelo's behavior was aggressive, but later observed that Ceelo accepted petting, remained calm, allowed handling, enjoyed training exercises, and interacted politely.

---

[2] App. to Opening Br. at A63.

3

Ceelo later became available for adoption and, on February 27, 2019, Laura Miles ("Miles"), the mother of BVSPCA staff member Alexandra Ford ("Ford"), adopted Ceelo. But Miles returned to the BVSPCA just five days later to surrender Ceelo because he was "chasing [her] cats."[3] That same day Joseph Riad ("Riad"), went to the BVSPCA with the intention of adopting a dog. While in the reception area, Riad observed Ceelo sitting with Miles and inquired about Ceelo's availability. Ford, who was clocked in for work, took Ceelo by his leash and led Ceelo and Riad to the BVSPCA's fenced-in play area so the two could interact. This interaction lasted approximately ten minutes during which Ceelo was kept on a leash ten to fifteen feet away from Riad. Even so, Riad testified that he was able to pet Ceelo. Riad, Ford, and Ceelo then returned to the reception area, where Riad expressed his intention to adopt Ceelo. This prompted the BVSPCA's receptionist, Stacy Calvert, to ask Riad to fill out a "Getting to Know You" form—essentially, the BVSPCA's adoption application. Riad left the lobby to retrieve his driver's license from his vehicle. Miles, Ford, and Ceelo, still on the leash held by Ford, remained in the lobby. When Riad returned, Ceelo, who was still on the leash held by Ford, lunged at and bit Riad's right hand.[4]

---

[3] *Id.* at A60–62.

[4] There is conflicting testimony as to whether Riad leaned down to pet Ceelo after he returned from getting his license. *Compare* App. to Opening Br. at A73, App. to Answering Br. at B300 *with* App. to Opening Br. at A92–93, App. to Answering Br. at B61–62.

4

The BVSPCA called emergency medical services and the Delaware Office of Animal Welfare. While waiting for emergency services to arrive, Miles filled out and signed a "Return Contract"—the form required to surrender ownership of a dog back to the BVSPCA. Following his return to the BVSPCA, Ceelo showed signs of a "noticeable decline in behavior"[5] and was eventually euthanized at the recommendation of a BVSPCA veterinarian.

B

On February 26, 2021, Riad filed a personal-injury complaint in the Superior Court alleging that the BVSPCA was (i) strictly liable for Riad's injuries under 16 *Del. C.* § 3053F (the "Dog Bite Statute") and (ii) negligent because it knew, or should have known, that it had custody of a dog with vicious propensities that would charge at people, failed to warn the plaintiff of those vicious propensities, and did not exercise reasonable control over the dog. Riad alleged that he has a 25% permanent impairment to his injured hand and arm and that his medical expenses totaled a minimum of $43,298.84.

Following discovery, the BVSPCA moved for summary judgment. It asserted that (i) the BVSPCA was not "the owner . . . keeper, harborer[,] or custodian of [Ceelo] at the time of the incident" for purposes of strict liability; (ii) the Dog Bite Statute "should not apply to [the] BVSPCA as a matter of public

---

[5] App. to Opening Br. at A61.

policy"; (iii) plaintiff could not meet his burden of proof on negligence because he failed to provide a standard-of-care expert; and (iv) the BVSPCA was not negligent as a matter of law.[6]

Riad filed a cross-motion for partial summary judgment on the strict-liability claim, arguing that the BVSPCA met "the statutory definition as Ceelo's 'owner' at the time of the bite because [it] had custody of Ceelo."[7] Riad also opposed the BVSPCA's summary judgment motion on Riad's negligence claim, contending that whether Ceelo was "in the custody of and controlled by Laura Miles rather than the [BVSPCA]" at the time of the incident was a disputed issue of material fact.[8]

At a pretrial conference held while the motions were pending, the court noted its concern that Riad had failed to reply to the BVSPCA's argument that expert testimony was required to support Riad's negligence claim. After Riad argued that an expert was not required, the court requested, and the parties submitted, supplemental briefing on whether an expert was required to establish the applicable standard of care for negligence. Riad argued that "[e]xpert testimony is only relevant when the matter in issue is not one of common

---

[6] *Id.* at A47, A53, A54, A57.
[7] *Id.* at A118.
[8] *Id.* at A94.

6

knowledge"[9] and that whether the BVSPCA "exercised reasonable control over Ceelo at the time of the incident [was] a matter of common knowledge[.]"[10] The BVSPCA countered that expert testimony was required because the standard of care applicable to animal shelters and animal welfare organizations was outside the common knowledge of laypersons and that Riad's failure to identify an expert meant that he could not meet his burden of proof.

C

The Superior Court granted summary judgment in favor of the BVSPCA on both counts. On the strict liability claim, the court concluded that "the Dog Bite Statute does not apply to animal welfare organizations" because the General Assembly's intent in adopting the Dog Bite Statute was to "rein in irresponsible dog owners who were keeping vicious dogs as pets by eliminating the 'one free bite rule.'"[11] In the court's view, the BVSPCA and the dogs kept by it fell outside that group.

As to the negligence claim, the court determined that expert testimony was required because the BVSPCA's knowledge of whether "it had custody of a dog with vicious propensities [that] would charge at people," was based on a test "curated by a licensed veterinarian[.]"[12] And whether the BVSPCA complied with

---

[9] *Id.* at A123.
[10] *Id.* at A134 (emphasis omitted).
[11] Opinion at *3.
[12] *Id.* at *5.

7

the requirements of that test in its handling of Ceelo, according to the court, was outside the common knowledge of a juror. In consequence, because Riad had failed to identify an expert, he could not satisfy his burden of proof, and the Superior Court granted the BVSPCA's motion for summary judgment.

D

On appeal, Riad challenges the Superior Court's judgment on both counts. As to his strict liability claim, Riad argues that the Dog Bite Statute is unambiguous and applicable to the BVSPCA as an owner as defined in § 3041F. The BVSPCA responds by offering both a text-based and a public-policy argument that the Delaware General Assembly "did not intend for the dog bite statute to apply to entities such as the BVSPCA."[13]

As to the negligence claim, Riad argues on appeal that the court erred by ruling that an expert was "required to establish the degree of care a reasonably prudent person would or should exercise in controlling a dog with a known aggressive history[.]"[14] The BVSPCA responds that the Superior Correct correctly determined that expert testimony was required because "a jury would be required to decide whether [the] BVSPCA meets the standard of care applicable to a reasonable, prudent animal shelter in concluding whether an animal is suitable for

---

[13] Answering Br. at 14.
[14] Opening Br. at 17.

8

being offered for adoption and permitted to interact with proposed adopters[,]"[15] and that standard of care could only be established through expert testimony.

## II

## A

This Court reviews the Superior Court's grant of summary judgment *de novo*.[16] Summary judgment is only appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[17]

## B

We turn first to the central issue in this appeal: whether the BVSPCA is an "owner" within the meaning of the Dog Bite Statute, 16 *Del. C.* § 3053F. Statutory interpretation is a question of law, which we also review *de novo*.[18] "If statutory text is unambiguous, this Court's role is limited to an application of the literal meaning of the statute's words."[19] A statute is ambiguous only when it "is reasonably susceptible of different conclusions or interpretations[.]"[20] A statute is not ambiguous simply because the parties dispute its meaning.[21] "If a statute is

[15] Answering Br. at 22.
[16] *Ridgeway v. Acme Mkts., Inc.*, 194 A.3d 372, 2018 WL 4212140, at *3 (Del. Sept. 5, 2018) (TABLE).
[17] Del. Super. Ct. Civ. R. 56(c).
[18] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020).
[19] *Dennis v. State*, 41 A.3d 391, 393 (Del. 2012).
[20] *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985).
[21] *Wiggins v. State*, 227 A.3d 1062, 1066 (Del. 2020).

unambiguous, there is no need for judicial interpretation, and the plain meaning of the statutory language controls."[22]

C

Chapter 30F of Title 16 of the Delaware Code is titled "Animal Welfare" and nested within it is a subchapter containing "General Provisions Concerning Dogs." The Dog Bite Statute, consisting of a single sentence, is one of those provisions. It states:

> *The owner of a dog is liable in damages for any injury, death, or loss to person or property that is caused by such dog*, unless the injury, death, or loss was caused to the body or property of a person who, at the time, was committing or attempting to commit a trespass or other criminal offense on the property of the owner, or was committing or attempting to commit a criminal offense against any person, or was teasing, tormenting, or abusing the dog.[23]

The term "owner" is defined in the subchapter's definitional section as "any person who owns, keeps, harbors, or is the custodian of a dog."[24]

---

[22] *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999); *see also LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 932–33 (Del. 2007) ("An unambiguous statute precludes the need for judicial interpretation[.]").

[23] 16 *Del. C.* § 3053F (emphasis added). The BVSPCA does not contend that Riad was engaged in any of the behaviors described in the latter portion of the statute.

[24] 16 *Del. C.* § 3041F(6). The BVSPCA acknowledges Riad's argument that the term "person" applies to corporations and is applicable to the BVSPCA as a non-profit corporation. *See* Answering Br. at 12. The BVSPCA does not argue that it is not a "person." *Id.* We note that the term "person" is not defined in § 3041F, but that 1 *Del. C.* § 301 sets forth "[t]he rules of construction and the definitions . . . [that] shall be observed in the construction of this Code and all other statutes, unless such construction would be inconsistent with the manifest intent of the General Assembly, or repugnant to the Code or to the context of the same statute" and defines the term "person" to include "corporations, companies, associations, firms, partnerships, societies and joint-stock companies, as well as individuals." 1 *Del. C.* § 302(15); *see also* Bryan A. Garner, *Garner's Dictionary of Legal Usage*, 670 (3d ed.) ("[s]o far as legal theory is

Riad asserts that the Dog Bite Statute is unambiguous and does not contain an exception for animal welfare organizations. The BVSPCA counters with two arguments, one text-based and the other grounded in public policy. In its text-based argument, the BVSPCA points to the separate definitions of the terms "owner" and "animal shelter" in § 3041F as "a clear indication that the Delaware legislature did not intend for the dog bite statute to apply to entities such as the BVSPCA."[25] In its public policy argument, the BVSPCA asserts that the statute is ambiguous because "a literal interpretation of the words of the statute would lead to an absurd or unreasonable result that could not have been intended by the legislature."[26]

As noted, the BVSPCA's text-based argument rests on the separate definitions of "animal shelter" and "owner" in § 3041F. The BVSPCA argues that, when interpreting a statute, we should harmonize each of its parts and that the absence of any references to animal shelters in the definition of "'owner'" "signal[s] that the term is not included in the term owner."

True, under traditional canons of interpretation, "in determining whether a statute has a plain meaning, the interpreter must consider the whole act, and not

---

concerned, a person is any being whom the law regards as capable of rights and duties. Any being that is so capable is a person, whether a human being or not[.]").
[25] Answering Br. at 14.
[26] *Id.* at 12–13.

just one particular provision."[27]  These canons, sometimes referred to as "whole act"[28] or "whole-text"[29] canons, "seek relative statutory harmon[y] or coherence."[30] But "[c]onsistent with traditional judicial practice[s] . . . harmonization must remain subordinate to ordinary meaning."[31]  Here, there is nothing "intricate, obscure, or doubtful"[32] about § 3041F's definition of "owner."

At any rate, we discern no disharmony in § 3041F's definitions.  For one thing, the BVSPCA's conclusion—that the separate definition of "animal shelter" effectively excludes it from the definition of "owner"— does not necessarily follow from its premise; it does not explain why an animal shelter cannot be encompassed within the unambiguous—and expansive—definition of owner. Indeed, the other definitions found in § 3041F recognize that, as written, an entity might fall within more than one definition.  The definition of "Retail dog outlet," for instance, explicitly excludes animal shelters.  The drafters apparently recognized that, but for this exclusion, an animal shelter could fall within the definition of a "Retail dog outlet."  Stated differently, Section 3041F's definitions

---

[27] William N. Eskridge Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution*, 86 (2016) ("Eskridge").

[28] *Id.* at 85–133.

[29] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 167 (2012) ("Scalia & Garner").

[30] Eskridge at 102.

[31] *Id.* at 103.

[32] As Sir Edward Coke explained four-hundred years ago, "[i]f any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other." 1 Edward Coke, *The First Part of the Institutes of Laws of England, or a Commentary upon Littleton* § 728, at 381a (14th ed. 1791) (quoted in Scalia & Garner at 167).

themselves appear to recognize that more than one definition could be, absent an explicit exclusion, applicable to a single person. Moreover, we cannot ignore the General Assembly's exclusion of animal shelters from the "Retail dog outlet" definition while choosing not to exclude animal shelters from the definition of "owner." Thus, we conclude that the BVSPCA's status as an animal shelter does not mean that it could not, at the same time, be an owner.

Curiously, however, the Superior Court did not confront the parties' text-based arguments, eliding altogether the question whether § 3053F, as informed by the definition of "owner" in § 3041F, is ambiguous. Instead, it focused on the BVSPCA's argument that the Dog Bite Statute is ambiguous because its literal interpretation would violate public policy. The court turned first, not to the statute's plain meaning, but to the General Assembly's intent in enacting it. Quoting the Superior Court's 2012 decision in *Tilghman v. Delaware State University*, the court concluded that: "[t]he Legislature's intent with respect to the Dog Bite Statute [wa]s clear. The intent was 'to rein in irresponsible dog owners who were keeping vicious dogs as pets by eliminating the 'one free bite rule.'"[33] Although the Superior Court quoted only *Tilghman*, that opinion is grounded in a

---

[33] Opinion at *3 (citing *Tilghman*, 2012 WL 3860825, at *11). *Tilghman* in turn cited *Brady v. White* for its statement of legislative intent. *See Tilghman*, 2012 WL 3860825, at *10 & nn.84–85 (citing *Brady v. White*, 2006 WL 2790914, at *3–4 (Del. Super. Ct. Sept. 27, 2006)).

13

2006 Superior Court decision, *Brady v. White*.[34] That decision is where the court's statement—a problematic one, as we will explain—about the General Assembly's intent originated. We therefore next discuss how *Brady* led to *Tilghman*, which in turn drove the Superior Court's reasoning in this case.

In *Brady*, a veterinarian brought a claim under the Dog Bite Statute against the owner of a dog, "Kato," that bit her while she was treating him for a possible gunshot wound to the leg.[35] The owner argued that the common-law negligence defense of assumption of the risk was applicable because Brady had been Kato's veterinarian for seven years and had knowledge of his vicious propensities, which included past incidents of biting.[36] Brady in turn argued that the assumption-of-the-risk defense was inapplicable because the Dog Bite Statute imposed strict liability.[37]

The Superior Court concluded that the Dog Bite Statute was ambiguous because its "strict literal meaning" conflicted with the General Assembly's "true intent and purpose" in enacting it.[38] In the court's view, the 139th General Assembly's intent in passing the Dog Bite Statute was informed by the 140th General Assembly's subsequent enactment of a provision establishing a "Dog

---

[34] *See Tilghman*, 2012 WL 3860825, at *10 & nn.84–85 (quoting *Brady*, 2006 WL 2790914, at *3–4).

[35] *Brady*, 2006 WL 2790914, at *1.

[36] *Id.* at *2

[37] *Id.* at *1.

[38] *Id.* at *4.

14

Control Panel," which was authorized to deal with dangerous dogs; a "Special CDC Report"; and a single case in the New York Court of Appeals.[39]  Looking to these sources, the court concluded that both the 139th and 140th General Assemblies were "occupied with the well-publicized and shocking problems caused by people who were irresponsibly keeping vicious dogs as pets."[40]  Thus, as the court saw it, "[b]y enacting the dog bite statute, the legislature merely intended to eliminate the old 'one free bite' rule" and the court determined it would "view the law as doing only what needed to be done."[41]

Although the court acknowledged that the "Plaintiff's point that the statute contains specific exceptions . . . support[e]d Plaintiff's view that if the legislature did not mean for the new law to favor veterinarians, it would have said so," the court concluded that "[t]he better view [was] that in the 139th General Assembly's waning moments, the legislature was focused more on the growing wave of innocent people being injured by vicious dogs, and not at all on protecting veterinarians from their patients."[42]  The court granted summary judgment in the owner's favor.

---

[39] *Id.* at *3 & n.22 (citing CDC Special Report:  Breeds of dogs involved in fatal human attacks in the United States between 1979 and 1998, JAVMA, Vol. 217, No. 6 (Sept. 15, 2000) and *Carter v. Metro N. Assoc.*, 255 A.D.2d 251 (N.Y. App. Div. 1998)).
[40] *Id.*
[41] *Id.* at *4.
[42] *Id.*

The *Brady* court's analysis is flawed in two respects. First, its conclusions that a literal interpretation of the Dog Bite Statute leads to an "unreasonable, unjust[,] or absurd consequence" is unsupported by any analysis or explanation.[43] Second, its favoring of the statute's "true intent and purpose" over its "strict literal meaning,"[44] assumes that there was competent evidence that the General Assembly intended to limit the statute's reach to "people who were irresponsibly keeping vicious dogs as pets."[45] The legislative record does not support this assumption.

As support for its conclusions that "the 139th and 140th General Assemblies were occupied with the well-publicized and shocking problems caused by people who were irresponsibly keeping vicious dogs as pets,"[46] and that "by enacting the dog bite statute, the legislature merely intended to eliminate the old "'one free bite' rule" the court pointed only to the fact that the 139th and 140th General Assemblies had both passed laws concerning dogs; it also cited two sources in a footnote—a CDC Special Report and a New York Opinion.[47]

To be sure, those General Assemblies both passed legislation related to dogs—the 139th General Assembly passed the Dog Bite Statute and the 140th

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at *3.

[46] *See id.* at *3–4 & nn.19–21.

[47] *Id.* at *3 & n.22.

General Assembly passed the "dangerous dog law."[48]  But those facts alone do not support the court's determination of the General Assembly's intent.  In addition, although both statutes appeared in Title 7, Chapter 17, "Game, Wildlife and Dogs," they were placed in separate subchapters.  The provisions passed by the 140th General Assembly creating and empowering a Dog Control Panel to deal with *dangerous* dogs, were contained in the Subchapter III, "Dangerous and Potentially Dangerous Dogs."[49]  By comparison, the Dog Bite Statute, which holds only the owner of "*a dog*" liable, was contained in the Subchapter I, "General Provisions."[50]  Moreover, there is also no indication that the General Assembly considered the CDC Special Report or New York opinion cited by the Superior Court.

The *Brady* court, to be clear, was not concerned with identifying the classes of dog owners who were subject to strict liability under the dog bite statute.  Its focus, instead, was on the availability of the affirmative defense of assumption of the risk, an issue that is not before us here.

Be that as it may, six years later, in *Tilghman*, the Superior Court relied on *Brady*'s discovery of the General Assembly's intent when considering a claim under the Dog Bite Statute.  This time the offending dog was a state-owned police K-9.  The court first concluded that applying the Dog Bite Statute to State

---

[48]   *See*   Del.   S.B.   355,   140th   Gen.   Assem.   (2000),   *available   at* https://legis.delaware.gov/BillDetail?LegislationId=9316.
[49] *Id*.
[50]   *Compare   id.   with*   Del.   S.B.   370,   139th   Gen.   Assem.   (1998),   *available   at* https://legis.delaware.gov/SessionLaws/Chapter?id=20269.

defendants would have required the court to ignore "the statutory regime created by the State Tort Claims Act . . . conclusively establish[ing] how and when the State lowers its shield of sovereign immunity."[51] Because that result would have been unreasonable, the court found the Dog Bite Statute was inapplicable to dogs that are state-owned or in state service.[52] But the court did not rely exclusively on the conflict between the Dog Bite Statute and the State Tort Claims act as a basis for denying liability. The court also concluded, relying on *Brady's* statement that the General Assembly's intent was to respond to "well-publicized and shocking problems caused by people who were irresponsibly keeping vicious dogs as pets," that it would not apply the Dog Bite Statute to state-owned dogs because they were not pets, but rather were "chiefly used for law enforcement purpose[s]" and the intent of the General Assembly in passing the Dog Bite Statute was "to rein in irresponsible dog owners who were keeping vicious dogs *as pets* by eliminating the 'one free bite rule.'"[53]

*Tilghman* in turn led the Superior Court in this case to announce a three-part test for determining whether the Dog Bite Statute is applicable to a particular defendant: "whether (1) [the] [d]efendant [is] an irresponsible dog owner; (2) [the] [d]efendant [is] keeping vicious dogs; and (3) . . . the aforementioned vicious dogs

---

[51] *Tilghman*, 2012 WL 3860825, at *11.
[52] *Id.*
[53] *Id.* at *10 (emphasis added).

18

are being kept as pets[.]"[54]   Applying this test to the BVSPCA, the court determined that the answer to each inquiry was no, and "[a]ccordingly, the [c]ourt will not stray from the Legislature's intent and will not apply the Dog Bite Statute to animal welfare organizations such as [the BVSPCA]."[55]

In our view, the asking of those three questions is not supported by, and is in fact inconsistent with, the plain meaning of §§ 3053F and 3041F(6).  Neither § 3053F's text nor § 3041F(6)'s definition of "owner" require a showing of a dog owner's "irresponsibility," a dog's "viciousness[,]" or a dog's status as a pet.  Nor does the statute—explicitly or implicitly—exempt an "animal welfare organization," a concept not defined in the statute, from the definition of owner.  In straightforward language, § 3053F "holds an 'owner' liable in damages for any injury, death, or loss to person or property that is caused by such dog."[56]  And owner is defined in § 3041F(6) as "any person who owns, keeps, harbors, or is the custodian of a dog."[57] Thus, we conclude that the Dog Bite Statute is unambiguous and does not contain an exception for animal welfare organizations.

---

[54] Opinion at *3.

[55] *Id.*

[56] 16 *Del. C.* § 3053F.  The Dog Bite Statute was originally enacted by the 139th General Assembly in 1998 as 7 *Del. C.* § 1711.  It has been redesignated twice—as 9 *Del. C.* § 913 and then 16 *Del. C.* 3053F—but its text has remained the same. *Compare* 7 *Del. C.* § 1711 (eff. July 13, 1998 to June 30, 2010) *with* 9 *Del. C.* § 913 (eff. July 1, 2010 to May 24, 2016) *with* 16 *Del. C.* § 3053F (current).

[57] 16 *Del. C.* § 3041F(6).  The term "owner" was not included in the "definitions" section of the subchapter containing the Dog Bite Statute until its present iteration. *See* 7 *Del. C.* § 1701 (eff. July 13, 1998 to Dec. 31, 2009) and 9 *Del. C.* § 901 (eff. July 1, 2010 to May 24, 2016).

## D

The court also determined "[a]s further support for the Dog Bite Statute being inapplicable to animal welfare organizations," that application of the Dog Bite Statute against animal welfare organizations "would violate public policy."[58] The court reasoned that, "[i]f the Dog Bite Statute were applicable to animal welfare organizations, the nonprofit's work would be essentially impossible."[59]

But as with its analysis of the legislature's intent, the Superior Court's public policy analysis was ill advised. The statute itself unambiguously proclaims the public policy of our State.[60] Dog owners, a class that is defined and that does not exclude animal welfare organizations, are to be held strictly liable for injuries caused by their dogs. Where a statute is unambiguous, our courts' own sense of appropriate public policy should not "usurp the General Assembly's legislative powers by ignoring plain statutory text."[61]

To be clear, we express no opinion regarding the wisdom of the General Assembly's decision to eschew an exemption to the statute for animal welfare organizations or its failure to distinguish between dogs who are kept as pets rather than for other purposes. Such questions are beyond our purview. We merely hold

---

[58] Opinion at *3.
[59] *Id.*
[60] *See State Farm Mut. Auto. Ins. Co. v. Kelty*, 126 A.3d 631, 641 (Del. 2015) ("[w]here the language of the statute itself is unambiguous . . . it would be error to interject our own view of what Delaware policy should be when the General Assembly has made its intentions clear.").
[61] *In re Last Will & Testament of Palecki*, 920 A.2d 413, 415 (Del. Ch. 2007); *see also Kelty*, 126 A.3d at 641.

that the BVSPCA is not exempt from the definition of "owner" as defined in § 3041F(6) and as applicable to § 3053F.

That said, whether the BVSPCA was Ceelo's owner as defined by § 3041F(6) at the time of the incident remains a disputed question of fact. Riad alleges that the BVSPCA was both the legal owner and custodian of Ceelo at the time of the bite because Ford took Ceelo and Riad to the BVSPCA's play yard, an area not open to the public, and Ceelo's "Animal View Report" indicates he was being placed back in their system.[62] The BVSPCA claims that, because Miles did not execute the "Return Contract" until after the bite incident, she remained Ceelo's legal owner, and the BVSPCA was neither Ceelo's legal owner or custodian.[63] We reverse and remand to the Superior Court for resolution of that factual dispute.

III

A

Riad also challenges the Superior Court's grant of summary judgment in the BVSPCA's favor on his negligence claim. To prevail on a claim for negligence, a plaintiff must prove by a preponderance of the evidence that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, (3) the

---

[62] *See* Opening Br. at 12–13 & n.10 ("[w]hile legal ownership may be disputed, [d]efendant's possession of the dog is not."); Reply Br. at 10.

[63] *See* Answering Br. at 15–16.

21

plaintiff was injured, and (4) the defendant's breach was the proximate cause of the plaintiff's injuries.[64]

A plaintiff alleging negligence must establish that the defendant "failed to exercise the care of a reasonably prudent person under all of the circumstances."[65] What constitutes the standard of care required of a reasonably prudent person "is not a definite rule easily applicable to every state of facts."[66] Rather, the details of the standard must be formulated in the light of the peculiar facts of each case.[67] The jury will typically decide the standard of care when the facts are within their common knowledge.[68] Only when the standard of care requires resort to technical or other complex principles, or is applicable to a professional, must the plaintiff establish the standard of care through expert testimony.[69]

---

[64] *Ridgeway*, 2018 WL 4212140, at *2.

[65] *Delmarva Power & Light v. Stout*, 380 A.2d 1365, 1367 (Del. 1977).

[66] *Id.*

[67] *Id.*

[68] *Ridgeway*, 2018 WL 4212140, at *3.

[69] *Id.* at *3 & n.18 (collecting cases concluding that expert testimony has been required to establish the standard of care applicable to: a security guard dealing with a suspected shoplifter; a tradesman repairing an ice machine; a tradesman repairing electrical circuity; and a construction site accident, but that expert testimony has not been required to show the standard of care for: a property manager with no expertise or specialized training; to show that "melting snow can create ice"; the design of a mop; or a slip on a wet floor). *See also Jackson v. Hopkins Trucking Co., Inc.*, 3 A.3d 1097, 2010 WL 3397478, at *4 (Del. Aug. 30, 2010) (TABLE) (holding that "expert testimony is required to establish the standard of care applicable to a pre-trip inspection of a trailer because laypersons are not familiar with the frequency, method, and requirements for conducting pre-trip inspections of commercial trucks and trailers to be used in off-loading cargo at a port."); *Torrent Pharma, Inc. v. Priority Healthcare Distrib., Inc.*, 2022 WL 3272421, at *18 (Del. Super. Ct. Aug. 11, 2022) ("expert testimony is not required to prove general negligence").

B

Riad argues that the Superior Court committed legal error by ruling that an expert was required as a matter of law to establish the degree of care a reasonably prudent person should exercise in controlling a dog with a known aggressive history.[70]  The BVSPCA counters that it "ha[s] no duty to plaintiff"[71] and that the applicable standard of care is not that of a "reasonably prudent person" but of a reasonably prudent animal shelter in the "decision making process . . . with regard to its adoption procedures and permitting [a] dog to interact with a potential adopter."[72]  The BVSPCA further asserts that, because an animal shelter must comply with Animal Welfare Law and screening guidelines established by a licensed veterinarian, the standard of care falls outside the common knowledge of a juror.[73]

As earlier noted, the Superior Court agreed with the BVSPCA and held that expert testimony was required for Riad to prove his negligence claim.  This was so, in the court's view, because "[t]he knowledge about what vicious propensities a dog may or may not possess stem[med] from the tests [d]efendant must perform on an animal before allowing any interaction with potential adopters."[74]  And because those standards "are curated by a licensed veterinarian and mandatory" for the

---

[70] Opening Br. at 17.
[71] Answering Br. at 18.
[72] *Id.* at 23.
[73] *Id.* at 19; Opinion at *4 & n.57.
[74] Opinion at *5 (internal citations omitted).

23

BVSPCA to follow, "[w]hether [d]efendant properly followed the required testing protocols with Ceelo [was] outside the common knowledge of a juror and must be explained by an expert."[75]

We disagree with the Superior Court's framing of the issue. As the court acknowledged, Riad's negligence claim rests on the BVSPCA's alleged knowledge of Ceelo's vicious propensities. Riad contends that this knowledge stemmed from by the BVSPCA's prior interactions with Ceelo, as documented in its "Animal View Report," which described Ceelo's history of lunging and aggression. Whether the BVSPCA failed to warn Riad of these propensities and whether Ford was negligent in her control over Ceelo is grounded, in Riad's view, on that knowledge. Thus, Riad's negligence claim as stated requires the jury to determine whether the BVSPCA acted with reasonable prudence in its handling of a domestic animal with known vicious propensities. That standard is not outside the ken of the average layperson.[76]

The BVSPCA's counterargument that, because it properly screened Ceelo before his adoption by Miles, it did not have knowledge that Ceelo had vicious propensities, might undermine Riad's negligence claim. Indeed, the BVSPCA might choose to support that argument with expert testimony, in which case Riad

---

[75] *Id.*

[76] *See* 33 Causes of Action 2d 293 § 25 (2007) ("the general nature of domestic animals is common knowledge among lay persons); *State v. Blatt*, 774 S.E.2d 570, 582 (W. Va. 2015) ("The habits and propensities of domestic animals are matters of common knowledge to all[.]") (internal citation omitted)).

might respond accordingly with his own expert. But this does not mean that Riad is required to provide expert testimony to establish the principal factual predicate of his negligence claim—that the BVSPCA was aware of Ceelo's vicious propensities and failed to take appropriate precautions in light of that awareness. Determining the facts surrounding these elements of Riad's negligence claim does not require "resort to technical or other complex principles[.]"[77]

Accordingly, we reverse the Superior Court's holding that expert testimony was required to establish the standard of care applicable under these particular circumstances.[78]

IV

For the reasons set forth above, we reverse the judgment of the Superior Court as reflected in its June 22, 2023 memorandum opinion and order and remand for further proceedings consistent with this opinion.

---

[77] *Ridgeway*, 2018 WL 4212140, at *3.

[78] As best we can discern, no jurisdiction requires expert testimony to establish ordinary negligence in a dog bite claim. *See* 3B C.J.S. Animals § 408 ("[i]n actions to recover for injuries to persons or damage to animals arising from the conduct of domestic animals, expert evidence or testimony is not required to establish ordinary negligence but may be required or sufficient on special issues."). *See also Pulido v. City of El Segundo*, 259 F. App'x 973, 975 (9th Cir. 2007) ("We can find no evidence that California law requires expert testimony in a dog-bite case. . . . It is possible that Pulido will not ultimately prevail on his negligence claim without an expert witness, but he may present his case.").